In the Matter of the Trust Estate of Woods, Weeks & Company. Appeal of William H. Perot, Trustee, and others. Appeal of Robert Garrett & Sons. Appeal of Drexel, Morgan & Co. Appeal of Joshua G. Harvey.

*Contracts by an Importing firm with their Bankers, who held Liens on certain Cargoes for Acceptances under Letters of credit—Pledge of Collateral securities, including the Firm's notes—Power to Bankers to sell on failure of Pledgors to put them in Funds to meet acceptances—Deed of Trust for the benefit of Creditors— Validity of the Contracts—Sale of the Firm's notes by the Bankers, and Application of the Proceeds in part payment of the Acceptances—Right of the Bankers to prove under the Trust deed for the Balance of their claim— Right of the Purchasers of the Notes to prove under the Deed for their full amount—Such right not affected by the fact that the Notes were purchased after Maturity—Rights of the Bankers under the Contracts not impaired by the Failure and insolvency of the firm, and the execution of the Deed of Trust—Right of a Debtor, apart from the Insolvent or Bankrupt laws, to prefer, in good faith, one Creditor to another—Restrictions upon the Right of parties to Contract.*

An importing firm in order to obtain possession of several cargoes as they arrived, made contracts with their bankers, who held liens on the cargoes for acceptances under letters of credit, by which they pledged collateral securities, with power to the bankers to sell the same at any time, in case the firm failed to put them in funds to meet the acceptances when due.  Part of the securities so pledged consisted of the firm's own notes, payable to their own order and endorsed by them in blank, and delivered to the bankers.  The firm failed and executed a deed of trust for the benefit of their creditors.  The bankers then, in pursuance of the power sold the notes and applied the proceeds in part payment of the firm's indebtedness to them for the acceptances which they had to pay.  A

Trust Estate of Woods, Weeks & Co.

Court of equity then assumed administration of the trust created by the deed. HELD:

1st. That these contracts having been made in good faith, are valid, and the bankers can prove under the deed, for the balance of their claim, and the purchasers of the notes having purchased in good faith, can prove for the full amount thereof.

2nd. That the subsequent failure and insolvency of the firm, and the execution of the deed of trust, did not prevent the carrying out of these contracts or take from the bankers any rights they held under them.

3rd. That as the power to sell at any time was expressly given by the contracts, the right of the purchasers to prove under the deed for their full amount, was not affected by the fact that they purchased the notes after maturity.

Apart from the provisions of the insolvent or bankrupt laws, a debtor has the right, provided he acts in good faith, to prefer one creditor to another.

The right of parties to contract as they please, is restricted only by a few well defined rules, and it must be a very plain case to justify a Court in holding a contract to be against public policy.

APPEALS from the Circuit Court of Baltimore City.

The opinion of the Court, together with the dissenting opinion of Chief Judge BARTOL, furnish a statement of the case.

The cause was originally argued before BARTOL, C. J., BOWIE, BRENT and MILLER, J. It was subsequently re-argued on notes, and submitted to BARTOL, C. J., BOWIE, BRENT, GRASON, MILLER and ALVEY, J.

*Randolph Barton* and *Skipwith Wilmer*, for William H. Perot, trustee, and others.

The principal question in this case is one which has never been decided in Maryland. Briefly stated, it is, whether a debtor can give his own notes, not merely as the

*evidence* of his indebtedness, but as *collateral security* for it ; or whether a simple contract creditor, holding notes of his debtor of the face value of $100,000, for instance, but upon which he has advanced to his debtor only $50,000, stands in any better position than if the notes only represented the $50,000 on their face.

These appellants contend that although a borrower of money may have given his notes for an amount far in excess of the amount really received, yet when he fails in business and makes an assignment for the benefit of his creditors, without preferences, the rights of the general creditors intervene, and the estate can in no way whatever be subjected to the payment of dividends upon a larger basis than that of the *real* debt.

1st. If Messrs. Robert Garrett & Sons had retained the notes and brought suit upon them at law, the measure of their recovery, (inasmuch as the notes were taken as collateral security only,) would have been the amount of the debt intended to be secured. This would have been the amount of the judgment. *Phillips & Maitland vs. Citizens' Bank*, 40 *Md.*, 570.

To a suit on the notes brought by Messrs. Garrett & Sons the obvious defence would have been the want of consideration beyond the real amount loaned.

2nd. In bankruptcy the Messrs. Garrett would have been limited to prove the *real* debt. The fictitious claim, (namely, the face value of the notes,) would not have been tolerated. *Ex parte Farnsworth, Lowell,* 497 ; *Ex parte Bloxam,* 6 *Vesey,* 449 ; *Ex parte Burn,* 2 *Rose,* 55 ; *In re Oriental Commercial Bank,* 7 *Ch. Appeals,* 99, 103 ; *Ex parte Macredie,* 8 *Ch. Appeals,* 535.

3rd. In equity the Messrs. Garrett, offering their claim for participation would have been limited to their real claim. As a matter of conscience they could not have sworn to a greater claim than the amount of money loaned. (It will be remembered that they did not *buy* the notes

outright, they only loaned money, taking the notes as collateral.) *Rigby vs. Macnamara*, 2 *Cox*, 415; *In re Oriental Commercial Bank*, 7 *Ch. Appeal Cases*, (*The Law Reports*,) 99.

In this case, on page 103, the Court says:

"But the principle itself—that an insolvent estate, whether wound up in chancery or in bankruptcy, ought not to pay two dividends in respect of the same debt—appears to me to be a perfectly sound principle. If it were not so, a creditor could always manage, by getting his debtor to enter into several distinct contracts with different persons for the same debt, to obtain higher dividends than the other creditors, and perhaps get his debt paid in full. I apprehend that is what the law does not allow; the true principle is that there is only to be one dividend in respect of what is in substance the same debt, although there may be two separate contracts."

Also, *In re Blakeley Ordnance Co.*, reported in *The Law Reporter*, (*Law Times Reports*,) *vol.* 21, *page* 12, also reported in *The Law Reports*, (8 *Equity Cases*, 244.) In this case the facts were identical in principle with the facts in the case at bar. The same claim was made by the creditor as is made here, and was emphatically denied. The insolvent Company had borrowed £4000, giving its acceptances for that amount; *and as security* had given thirty-two of its debentures for £250 each. The creditor sought to prove both on the acceptances and the debentures; the Court said:

"It is only one debt secured in various modes against themselves, and that distinction is perfectly plain as it appears to me. In every one of the cases which I have last put, you must prove against the Company itself, whether it is on the bill, or on the debenture, or on the covenant, you must prove, and you can only prove for the amount that is due."

The latest case is that of the *Third National Bank vs. The Eastern R. R. Co.*, 122 *Mass.*, 240.

The Bank was a creditor for $10,000.00, and held as collateral security, three of the Company's notes for $10,000.00. It is true an Act of Assembly under which the R. R. Co. was being wound up, was introduced into the case, but upon the claim of the Bank that it was entitled to dividends upon *all* the obligations of its debtor, the Court held that it was limited to its *real claim*, and says, "To enlarge a creditor's claim upon his debtor's estate, because the latter has promised to pay him a larger amount, whether by one or more instruments, is simply to sanction a new mode of secretely encumbering a debt as assets, and of defrauding creditors, either for the benefit of the debtor, or for that of some favored creditor. It is a thing which has never yet been allowed, and which ought not to be allowed, on grounds of public policy."

4th. Such claims are contrary to the spirit of our Registration laws. These laws are all intended to prevent *secret* liens. They are intended to prevent persons from loading their estates with liens which never come to light until they have failed. Yet to allow the claim of Drexel, Morgan & Co. the Garretts and Harvey, will be substantially to give the Messrs. Garrett a prior lien on the estate—a secret one at that—to the full extent of their real claim.

To allow their claim, is equivalent to giving effect to a promise on the part of Woods, Weeks & Co. to the Garretts, that in the event of failure, the latter "may prove for such a sum, no matter how large, as will produce dividends enough to pay back the money borrowed."

Such a proposition, if sustained, must be productive of gross frauds. Debtors on the verge of failure, will secure their friends by the creation of an unlimited number of notes drawn to suit the occasion, and presented against the insolvent estate for participation according to their full value. Equality among creditors will thus be fatally disturbed. False credit will be obtained by merchants, and in insolvent estates, whether being wound up in

equity under a deed of trust or in insolvency, the anomaly will be presented of persons who are creditors for $5000.00, proving claims for $50,000.00, either directly or through the medium of others.

5th. Drexel, Morgan & Co. *confessedly* purchased their notes amounting to $82,000, *after they had matured.* Harvey purchased his with full knowledge of the objections made to them by the trustee and the creditors. Both then stand merely on such title as the Garretts can pass to them, aided by no application of the doctrine of innocent purchasers.

It is contended then by Drexel, Morgan & Co. the Garretts and Harvey, that the Messrs. Garrett under the contract by which they obtained the notes in question, had the power to pass a perfectly valid title to Drexel, Morgan & Co. and Harvey—and that having thus transferred the notes, the purchasers can prove for their full face against the debtor estate, even if they, the Garretts cannot. But just that proposition was made in the case of the *Blakeley Ordnance Co.*, and the Court says, "then it was very ingeniously suggested, that they, (the creditors,) might sell the debentures; but the person to whom the debentures are sold and transferred, stands in no better position than the person who transfers them in respect of that particular debt. *You cannot by selling or transferring these debentures to ten persons, multiply the proof ten times over, you can only prove once for the debt.*"

The italics are ours, but are made to call attention to what seems to be an adjudication upon a case precisely like the one at bar. Possibly in the *Blakeley Ordnance Case* no specific authority to *sell* the collaterals, was shown to have been given by the borrower, as was the case in the contract between Woods, Weeks & Co. and the Garretts. But the "debentures" were *pledges* in the hands of the lenders, and by implication a right to sell in some form, either by the hands of the lenders or

by a decree under a foreclosure proceeding, inevitably arose.

So too in the Massachusetts case it was never doubted, but that if the collaterals were valid, as such, the right to sell them existed. So it would seem that the mere right reserved to *sell* the collaterals upon default, gives to the contract no peculiar virtue. The objection to it rests upon the ground that such contracts are, at least as against other creditors, inherently unlawful. When the rights of other creditors intervene, as in insolvency, bankruptcy, assignments for the benefit of creditors, &c., the original lender of money can claim a dividend on no more than his real debt—and that to a person with knowledge of his limited interest in the notes, he can pass no greater right than he has himself.

*William F. Frick,* for Robert Garrett & Sons.

Robert Garrett & Sons, under the contracts and by virtue of their lien as bankers, were *bona fide* holders for value of the notes in question, and as such holders had the right to dispose of them, in accordance with the provisions of the contracts. *Missa vs. Currie,* 1 *Appeal Cases L. R.,* 554, 567, 568, 569; *Bosanquet vs. Dudman,* 1 *Starkie,* 1; *In re Regents' Canal Works, Law Reports, Division* 1, *Chancery, Vol.* 3, 43–48; *Re Barnerd's Banking Co., Kellock's Case,* 18 *Law Times Rep., N. S.,* 672; *Re Agra & Masterman's Bank,* 16 *Law Times Rep., N. S.,* 162; *Re Blakeley Ordnance Co.,* 18 *Law Times Rep.,* 132; *Re The Natal Investment Co.,* 18 *Law Times Rep.,* 171; *Dickson vs. Swansea Railway Co.,* 19 *Law Times Rep., N. S.,* 346; *Roosevelt vs. Marks,* 6 *Johns Ch.,* 266; *Martin vs. Court,* 2 *Term,* 640; *Toussant vs. Martinet,* 2 *Term,* 100; *Heywood vs. Watson,* 4 *Bingham,* 496; *Ex parte Fairlie, Bonham & Co.,* 3 *Deacon & Chitty,* 285.

The contracts of June 2nd, July 5th and July 16th, 1877, by which the securities therein mentioned were sub-

stituted in place of the merchandise held as collateral, are valid; the parties were capable of contracting; the consideration was adequate; they were not against public policy. Woods, Weeks & Co., upon failure to comply with the terms of the contract, could not question the right of Robert Garrett & Sons to sell any of the securities; and in point of fact, they did not, nor did any member of their firm at any time, either before or after the sale of these notes by Robert Garrett & Sons, make any objection to such sale.

Therefore, neither the trustee (Wm. H. Perot) nor any of the creditors of Woods, Weeks & Co. are in a position to take any exception to the sale of these notes, except such as might lawfully have been made by Woods, Weeks & Co. The distribution of the assets of Woods, Weeks & Co. in this Court must be made upon the principles governing Courts of equity in the administration of insolvent estates; and there is no rule or principle to be found anywhere to the effect that any existing contract with a creditor is to be altered, modified or impaired by the circumstance that the debtor is not able to pay all his creditors in full.

Bankrupt laws may affect rights and remedies under contracts, because all contracts must be treated as having been made subject to them, but in the language of Vice-Chancellor PAGE WOOD, (in *Kellock's Case, Re Barnerd's Banking Co.*, 18 *Law Times Rep.*, 672,) "Where do you find anything that establishes it as a rule or a principle of equity, that when a man is insolvent that a new bargain has to be made with his creditors in consequence of his insolvency, and that his creditors are obliged to realize their securities in a way they were never before compelled to do, or be obliged to part with them without their being realized. This would be to make a new contract; and where do you find any ground for that contract—simply in the circumstance that the estate is not able to pay all its creditors? This case is not to be governed by the rules

prevailing in bankruptcy, or by rules or analogies of statutes. The whole bankrupt system between creditors and the estate is of a totally different character from that which exists between ordinary debtors and creditors." *Mason vs. Bogg,* 2 *Myl. & Craig,* 440 ; *Grimes vs. Saunders,* 3 *Otto,* 62 ; *Atlantic Delane Co. vs. James,* 4 *Otto,* 207, 213, 214 ; *Jerome vs. McCarter,* 4 *Otto,* 734, 739.

The Court should have ratified account "G," allowing to Joshua G. Harvey and Drexel, Morgan & Co. dividends upon the amounts of the notes held by them respectively ; and to Robert Garrett & Sons a dividend upon the amount of their claim, as reduced by credits of the amounts received from the sales to those parties of their collaterals, inasmuch as none of the other accounts stated by the auditor are based upon any principle of distribution which respects the rights of Robert Garrett & Sons and the parties to whom they made sales of their collaterals, under the provisions of the contracts with Woods, Weeks & Co.

*E. J. D. Cross* and *John K. Cowen,* for Drexel, Morgan & Co.

It is conceded that these appellants purchased, on the 15th day of November, 1877, of Robert Garrett & Sons, the notes of Woods, Weeks & Co., which were drawn to the order of said Woods, Weeks & Co., and by them endorsed. Said notes amounted to $82,000, for which they paid Robert Garrett & Sons $24,600, or thirty per cent. of their face value. The said notes were overdue when purchased. The appellants claim that they are entitled to a dividend on said notes from the estate of Woods, Weeks & Co., now in course of distribution under the provisions of the deed of trust ; and that account "G," wherein they are allowed $23,961, should be ratified, and the other accounts disallowed.

The notes purchased by these appellants being overdue on the 15th November, 1877, when they were purchased

from Robert Garrett & Sons, were bought at a fair market value, having reference to the amount of the dividend then understood as likely to be realized from the assets of Woods, Weeks & Co. As overdue notes, they were taken *subject only to the equities which arose out of the transaction to which they owed their origin, and which existed at the time of the transfer.* These equities, therefore, must be ascertained and determined by the terms of the contract under which they were issued by Woods, Weeks & Co. If under the provisions of that contract, the contingency had arisen under which Robert Garrett & Sons were authorized to make sale of these notes, there was no equity existing between the makers and holders to prevent a sale of them, which would bind Woods, Weeks & Co. to the payment of the full face thereof to the purchaser.

That contingency had arisen, and if Woods, Weeks & Co. were sued by these appellants upon those notes, they would have no valid defence to the action, and in point of fact, they appear upon the record as not making any objection or defence to the rights of these appellants as holders of the notes. If it will not lie in their mouth to say that they have any equity to resist payment of these notes, there is no ground upon which their trustee or other creditors can impeach the appellants' title to them.

The exceptions on the part of the trustee of Woods, Weeks & Co. are, that the notes purchased by these appellants of Robert Garrett & Sons were "illegal in their creation, and without consideration;" further, that they were taken by these claimants "with full knowledge that their legality was disputed, and that the consideration for them was denied" by the trustee and certain creditors. It appears, however, to be conclusively shown by the proof and admissions in the case, that at the time the notes were issued, Robert Garrett & Sons gave full value for them.

The fact that the sale to these appellants was made after the maturity of the paper, is relied upon by counsel for the trustee of Woods, Weeks & Co. as conclusive against our right to prove upon them to their face value. This is not so. "A promissory note is certainly negotiable as well after as before it becomes due," said this Court in *Annan vs. Houck*, 4 *Gill*, 331. *The makers of the paper held by us, intended and stipulated that these notes should be negotiable as well after as before maturity*, for they agreed with Robert Garrett & Sons to that effect. What other construction can be placed upon the provision in all the contracts under which the notes were taken, and merchandise equal or greater in value surrendered, where they say: "The said Robert Garrett & Sons may, at any time thereafter, proceed to sell said securities at either public or private sale, or otherwise, without notice of the time or place of sale, for the purpose of satisfying said credits." A power of disposition so extensive in regard to commercial paper, cannot be said to limit its negotiability to the period prior to its maturity, especially when the time within which this power could have been exercised before the maturity of each lot of paper given under the three contracts is considered.

The equities to which overdue paper are subject are limited to those arising out of the transaction which is the origin of the paper, and which existed at the time of the transfer. This is the rule. It is well stated by Justice CRESWELL, in the case of *Sturtevant vs. Ford*, 4 *Man. & Gr.*, 106.

What then are the *equities* attaching to these notes which prevent these appellants from proving them against the estate of the makers thereof, now in distribution under the deed of trust? None such exist. The positive provision in the contracts, that they might be sold at any time, for the purpose of providing funds to meet the letters of credit, is conclusive upon the question of the right of Robert Garrett & Sons to sell them after maturity.

It is a well settled rule of the law of notes and bills that accommodation notes or bills are negotiable as well after as before maturity. *Renwick vs. Williams,* 2 *Md.,* 356; *Charles vs. Marsden,* 1 *Taunt.,* 224, 225; *Sturtevant vs. Ford,* 4 *M. & G.,* 101, (43 *E. C. L.;) Davis vs. Miller,* 14 *Grattan,* 1; *Atwood vs. Crowdie,* 1 *Starkie Rep.,* 483; 1 *Daniel on Negotiable Instruments, secs.* 726, 786; *Smith vs. Knox,* 3 *Esp.,* 46.

The present case is stronger than that of overdue accommodation paper, in that the makers expressly stipulated in writing that the paper could be sold at any time. These notes "fulfilled the design of their makers, and accomplished the purpose for which they were issued." They have been applied to the precise purpose for which they were designed when originally made; that is to say, they have been sold to meet the default of the makers, in not covering the drafts, to secure which they were pledged.

There can be no question that if the appellants had purchased the paper before maturity they could recover upon it. When the paper was "sent into the world," to use Lord ELDON's expression, in *Smith vs. Knox,* 3 *Esp.,* 46, for the purpose of being "sold at any time thereafter," "the equity of the maker" certainly cannot be that the paper was sold after maturity.

By the contracts of substitution, the holders, Robert Garrett & Sons, were empowered by the makers to give an endorsee for value an absolute title to recover upon the notes. It is not questioned that Drexel, Morgan & Co. paid Robert Garrett & Sons, on the 15th day of November, 1877, $24,600 for the notes they now hold; their good faith has not been impeached. They are, therefore, holders for value, and entitled to prove against the estate of Woods, Weeks & Co. the notes which they have purchased.

*E. J. D. Cross* and *John K. Cowen,* for Joshua G. Harvey.

On the 12th day of November, 1877, the appellant purchased from Robert Garrett & Sons four notes, of $6000 each, of which Woods, Weeks & Co., were the makers and endorsers.   These notes being made by Woods, Weeks & Co. to their own order, and being by them endorsed, were transferable by delivery.   They were not due at the time they were purchased by the appellant.   They were offered to him by Mr. T. Harrison Garrett, at thirty-two and a half cents on the dollar, and having been informed by Messrs. Daniel and Alexander Woods, of whom he made inquiry, that the estate of Woods, Weeks & Co. would probably pay from forty to fifty per cent., certainly forty per cent., he purchased them at the price offered, and on the 12th of November, 1877, gave his check on the Western National Bank for $7800, the amount of the purchase money.

Under the well settled principles of commercial law the appellant must be considered as a *bona fide* holder, for a valuable consideration, of said notes, having acquired them in the ordinary course of business before maturity.

Woods, Weeks & Co. had made an assignment of their property to pay their debts.   The dividend estimated by competent persons was forty per cent.   The price paid was thirty-two and a half per cent.   There could be nothing in the price paid which would affect the transaction.

The appellant being a *bona fide* holder for value, without notice, is entitled to prove the four notes filed with his claim against the estate of Woods, Weeks & Co., to their full face value, unaffected by anything in the contracts under which the notes were given, and entirely free from any defects or infirmities in the title of the person from whom he purchased them, if there was any defect in that title.   *Davis vs. West Saratoga Building Union, No.*

3, 32 *Md.*, 285 ; *Gwyn vs. Lee,* 9 *Gill,* 137 ; *Daniel on Nego. Instruments, ch. XXIV ;* 1 *Daniel on Nego. Instruments, secs.* 771, 776 ; 2 *Daniel on Nego. Instruments, sec.* 1503.

*William F. Frick,* for the Western National Bank of Baltimore.

MILLER, J., delivered the opinion of the Court.

When Robert Garrett & Sons, bankers, issued the three letters of credit in favor of Woods, Weeks & Co., which enabled the latter to purchase and import the cargoes of sugar by the " Addie Hale," the " Mary C. Mariner " and the " Alice Bradshaw," the importing firm, by an agreement appended to each letter, agreed to furnish the Garretts with funds to meet the acceptances they might make under it, and as security therefor gave them a specific lien on the cargo to an amount sufficient to cover their advances, with full power to take possession and dispose of the same at their discretion, and agreed to endorse to them the bill of lading if so desired, and further pledged to them as security for any other indebtedness of the firm to them, any surplus that might remain either in the goods or proceeds thereof, after providing for the acceptances under that credit. When the cargoes severally arrived in Baltimore the acceptances of the Garretts had not matured, and they received the bills of lading and took possession of the cargoes as security for the indebtedness of the firm, according to the terms of the letters of credit and the contracts thereto attached.

But the firm being desirous of obtaining immediate possession of these cargoes for the purpose of their business as sugar refiners, after the arrival of each vessel, entered into a separate contract with the Garretts by which this object was accomplished. By these contracts the Garretts parted with their possession of, and lien on the cargoes, and received in lieu thereof certain collateral secu-

rities in each case. The terms of these several agreements are identical, and I shall take the case of the importation . by the "Addie Hale" as an illustration. The letter of credit under which this importation was effected was for $50,000, and the Garretts had accepted drafts thereunder to the amount of $40,000. When the cargo arrived the Garretts held the bill of lading and took possession of the sugar, and afterwards delivered it to the firm upon the latter giving them a *receipt* for the merchandise specified in the bill of lading "against *notes* deposited with them as collateral security, amounting to the sum of $60,140.78, as per memorandum on the other side." This receipt which embodies the contract and engagement on the part of the firm, then stipulates that if the drafts accepted by the Garretts be not covered by the firm at the time specified in the letter of credit, then the Garretts "may *at any time thereafter proceed to sell said securities,* at either public or private sale, *without notice of time or place* of sale for the purpose of satisfying said credit, and upon such sale said Garretts may purchase the whole or any part of such securities so sold, discharged from any right of redemption, and it is understood and agreed that any and all other securities belonging to the firm now in the hands of the Garretts shall be liable for any deficiency on account of this contract, and any surplus from this contract after settlement thereof shall be applied to any indebtedness that may be due or become due to said Robert Garrett & Sons." Of the securities, amounting in all to $60,140.78, referred to in this contract and noted thereon, $20,140.78 consisted of notes and bills, due and payable to the firm by their customers, and endorsed by the firm to the Garretts, and $40,000 consisted of the *firm's own notes, payable to their own order and endorsed by the firm in blank and by them delivered to the Garretts.* Some time after these contracts were made and the securities delivered thereunder, the firm failed and executed a deed of

trust conveying all their property to Perot as trustee for the benefit of their creditors. The firm, therefore, failed to meet their obligations to the Garretts, and the latter in pursuance of the power of sale under these contracts, sold *the notes of the firm* thus pledged as collateral security for their debt. Of these notes those sold to Drexel, Morgan & Co. were sold after their maturity, and those sold to Harvey were sold before they matured. The proceeds of these sales, as well as the amount collected from the other collaterals, were applied by the Garretts in part payment of the debt due to them, and a balance still remains due thereon. A Court of equity has taken charge of the administration of the trust created by the deed, the assets of the firm have been sold by the trustee, and the proceeds have been brought into Court for distribution. Under notice to creditors the Garretts have filed a claim for the balance thus due to them, and the purchasers of these notes have also presented them as claims against the fund, and the main question in the case is, have these purchasers a right to a dividend for the full amount of these notes?

It seems to me that this and all other controverted questions arising on these appeals depend altogether upon the validity or invalidity of these contracts. In other words, was it competent and lawful for the firm to draw their own notes, payable to their own order, endorse them in blank and deliver them to the Garretts as collateral security, with power to the pledgees in case of default by the pledgors, to *sell them* in the market for what they will bring, and apply the proceeds in discharge of the debts they were pledged to secure? There is nothing to show that these contracts were not made in good faith, nor is it pretended the Garretts did any anything under them which the contracts themselves did not expressly authorize. The power of sale is expressed in the broadest terms. It may be made without notice of time or place, and *at any time* after default whether the notes had then matured or not. The fairness

and good faith of the sale stand unimpeached. · Nor if the contracts be valid can it be pretended that the Garretts are responsible for the consequences resulting from the sale. It was their undoubted right to secure, if possible, by all lawful means full payment of this debt which was most justly due them. The contingency of a sale is expressly provided for, and its effects must have been within the contemplation of the parties when the contracts were made. Are they then valid and lawful contracts? In answer to this question I must say I am unable to perceive upon what ground they can be successfully assailed. Certainly not for want of consideration, for the Garretts upon the faith of them gave up the property they held which was ample security for the debt, and the firm acquired immediate possession of it for their business purposes. If it be said they constitute a preference, and are therefore void as against creditors, the answer is that apart from the provisions of the insolvent or bankrupt laws, a debtor has the unquestioned right, provided he acts in good faith, to prefer one creditor to another. No question under the insolvent or bankrupt laws arises in this case, and the failure of the firm and the execution of the deed of trust, in nowise prevented the carrying out of the contracts or took from the Garretts any rights which they held under them. On what principle can it be said that a contract like this between debtor and creditor, made intelligently and in good faith, can be altered in a way prejudicial to the creditor, or its execution prevented by the subsequent insolvency of the debtor? It has been argued that such contracts are against *public policy* and therefore void. But the right of parties to contract as they please is restricted only by a few well defined and well settled rules, and it must be a very plain case to justify a Court in holding a contract to be against public policy. It must be a case in which the common sense of the entire community would so pronounce it. But to apply this doc-

trine to a commercial contract of this description entered into in good faith between merchants, would, in my judgment, be as unwarranted as it is unprecedented.

But it is said the giving of these notes was a mere increase or duplication of the debt due by the firm to the Garretts, and they cannot be used or considered as collateral security therefor, that the amount of that debt diminished by the proceeds of the other collaterals, is all that is entitled to a dividend under this deed, and that such dividend must be distributed *pro rata* between the Garretts and the purchasers of the notes. It is true the effect of carrying out these contracts by a sale of the notes was to increase the *general indebtedness* of the firm, but it did not increase the debt then due the Garretts for which the notes were pledged as security. But this increase of general indebtedness is exactly what the contracts contemplated, and what the parties intended in case a sale was made, so that the question comes back at last to the validity of the contracts in this respect. Now, if instead of giving these notes, in the form in which they were drawn, to the Garretts as collateral security, the firm had placed them in the hands of a broker, for sale, and he had sold them to the same parties, and for the same price the Garretts obtained for them, and the firm had received the proceeds and applied them to this debt, exactly the same result would have followed. There would have been the same increase of the general indebtedness of the firm and the same dimunition of the Garrett debt, which was effected by the sale under the contracts, and in the case supposed it will hardly be contended that the purchasers would not have had a valid claim against the firm for the full amount of the notes. Such notes are constantly sold on the streets in all the large commercial cities of the country, and it is not uncommon for merchants to resort to this mode of raising money. However hazardous it may be, there is nothing unlawful in it,

and it cannot be doubted but that the purchasers acquire a good title to such paper. It is apparent to my mind, that it was in view of this recognized practice, and the acknowledged rights of purchasers in such cases, that these contracts were made and the notes sold thereunder. With this *right of sale*, the notes became, in the hands of the Garretts, a valuable and reliable security for the debts due to them under the letters of credit, and I am unable to discover any ground on which the firm or their other creditors can impeach the transactions. The authorities cited in support of opposite conclusions, while differing in other respects, appear to me to be clearly distinguishable from the present case in that there is here *an express power of sale*, which the parties intended if carried into effect, should result in the consequences which have followed, and which has been *actually executed.* Expressions dropping *obiter* from Judges in one or two cases only, even if they tend to support such conclusions, are wholly insufficient to establish them, and I have seen no case in which it has been necessary to decide, or in which it has been decided that such contracts are either unlawful or ineffectual. On the contrary, there are decisions entitled to the highest respect, which in my judgment, go very far to sustain them. I refer to the cases of *The Morris Canal & Bank Company vs. Fisher*, 1 *Stockton's Ch. Rep.*, 671, and *In re Regents Iron Works Company*, (*Law Rep.*,) 3 *Ch. Div.*, 43, which was decided in 1876.

In the first of these cases,. the facts are briefly these : The Canal Company borrowed $1500 from Mr. Lewis, and gave him their note for that amount, at eight months, and at the same time deposited with him as collateral security, their own bonds to the amount of $3000. The note was not paid at maturity, and Lewis, after notice to the Company, advertised and sold the bonds at public auction. The bonds did not sell for enough to pay the note, and Lewis recovered a judgment against the Company for the

balance. Fisher, the purchaser of the bonds, then insisted upon his right to be recognized as their creditor for the full amount of the bonds, and this claim was resisted by the Company. But upon a bill filed to enforce it, the chancery Court decided, (and that decision was affirmed by the unanimous judgment of the Court of Appeals,) that the claim was well founded, and that the purchaser was entitled to the extent of the bonds held by him, equally with all the other bondholders, to the benefit of the mortgage given by the Company on all their property as security for the bonds they had authorized to be issued. In the latter case it appears that the Iron Works Company resolved to issue one hundred debentures of £250 each. Sixty of these were taken up by different persons, and then the International Financial Society agreed to advance to the Iron Works Company £8000, by discounting their notes to that amount, bearing ten per cent. interest, and as collateral security for the money so advanced, the Company gave to the Society the other forty debentures amounting to £10,000. It was also agreed that if the notes were not paid, the Society should be at liberty to sell the debentures, and apply the proceeds of sale towards the payment of what remained due to them, but this power of sale was *never exercised,* and the Society *held on* to the debentures. The Company was afterwards ordered to be wound up, and there was in Court a considerable sum, the proceeds of their property. The Society to whom about £5600 was due for principal and interest, claimed to prove for the £10,000, and to share with the other debenture holders. Now in this state of facts, how was the case dealt with by the Court? The *Vice-Chancellor,* (MALINS,) was of opinion and ordered that the Society was entitled to prove for the amount of the forty debentures transferred to them, *pari passu* with the holders of the other sixty, but is not to receive more in the whole than what is due them for principal, interest and costs, in respect

Trust Estate of Woods, Weeks & Co.

of the £8000 advanced by them with ten per cent. inte-
rest.　On appeal, it was argued that these debentures
might perhaps have been issued at a discount, but could
not be issued as collateral security; that the property of
the Company might be made collateral security, but not
these debentures.　But the order was sustained and the
appeal dismissed.　JAMES, L. J., in delivering his judg-
ment says : "the Company has dealt with these forty de-
bentures, by making them a collateral security for the sum
of £8000, and interest at ten per cent.　That was the bar-
gain between the Financial Society and the Company.　The
Company could not recede from that bargain, and I cannot
see that there is any equity on the part of the holders of
the other sixty to alter the bargain between the debtors
and the creditors."　MELLISH, L. J., says : "as between
the Company and the Society, there is no doubt that the
debentures were to be a collateral security for the money
which was lent upon the promissory note and interest.
That was the bargain between them, and one of the terms
of the bargain was that the Financial Society was to be en-
titled to sell the debentures.　*　*　Then the real ques-
tion is, have the other debenture holders any equity to
prevent that bargain from being carried out?　*　*　I
do not see any reason why they should complain that the
directors issued them as a collateral security, for the pay-
ment of the notes and interest.　They are not injured as
the debentures cannot be paid twice over—they can only
be paid once.　The order treats them as a collateral secu-
rity, and says that they are to be availed of until the
holders are paid the whole amount for which they were
intended to be a collateral security.　That order appears
to me to be quite correct."　And BAGGALLAY, A. J., says :
" I am of the same opinion.　It appears to me that the
directors had power to do that which they did, namely, to
issue the debentures for £10,000, as a collateral security
for the loan of £8000, which was primarily secured by the
promissory notes."

These cases have been cited, not as conclusive of this, because the facts are not identical, and it is possible there may be some distinction between them, but in support of the position that other obligations of the same party may be issued and used, and treated as collateral security coupled with a power of sale for a debt which he owes. Now if it be once conceded that it is competent and lawful for a merchant to make a note payable to his own order, endorse it in blank, and sell it on the street through a broker in order to raise money to carry on his business, why may he not, for like business purposes, give such a note as collateral security for an existing debt, with power to his creditor to sell it in the market in case he makes default in paying that debt? Other creditors are no more injuriously affected, and he no more "encumbers his assets to the prejudice of his other creditors" by the one transaction than by the other, and I cannot see what equity they have to prevent such a contract from being carried out, or what legal right of theirs it invades, if it be made and executed in good faith.

Holding then that these contracts are valid and effective, I do not think the question whether the notes were sold before or after maturity at all material. The power to sell after maturity is expressly given by the contracts, and when so sold the notes fulfilled the design of their makers, and accomplished the purpose for which they were issued as effectually as if they had been sold before maturity. In the face of these contracts the makers have no equity to set up against the notes, and the purchasers could safely take them, though overdue. In the case of *Renwick vs. Williams*, 2 *Md.*, 356, Mrs. Chase loaned her grandson, Barney, her promissory note for $2000. He gave her nothing for it. After its maturity he transferred it to Renwick in settlement of two bills of furniture, amounting to $755.50, and the Court held that Renwick was entitled to recover the whole amount of the note against the

executors of the maker.    Other authorities almost without number could be cited to the same effect.    The present case, however, is much stronger than that of overdue accommodation paper, because the makers have here expressly stipulated in writing that the notes might be sold at any time, as well after as before maturity.

Inasmuch as all the dealings between the Garretts and this firm were founded on contracts identical with the one thus noticed and considered, and all the notes held under these several contracts were disposed of to the same parties, it follows, in my judgment, that account G is stated upon correct principles, and the order appealed from which ratisfies account L should be reversed upon the appeals taken by the Garretts, by Drexel, Morgan & Co., and by Harvey.

As respects the appeal taken by the Western Bank, all that need be said is that this Court has been informed by the Bank's counsel, since the appeal was taken, that its claim has been settled and paid in full, and hence no question presented by that appeal is before the Court, even if any different question from those already considered in this opinion would have arisen if the claim had not been paid and settled.

I am instructed by a majority of the Judges who have participated in the consideration and decision of this case, to say that they concur in the views expressed in this opinion, and the result therefore is, that the order appealed from must be reversed and the cause remanded, to the end that an account may be stated distributing the fund accordingly.

The costs of these appeals is directed to be paid out of the fund.

*Order reversed, and*
*cause remanded.*

(Decided 17th July, 1879.)

BARTOL, C. J., filed the following dissenting opinion:

The questions on these appeals arise upon the distribution of the property and effects of Woods, Weeks & Co. among their creditors, under their deed of trust made to William H. Perot, dated July 24th 1877.

On the petition of Perot, the trustee, the Circuit Court took jurisdiction of the trust estate, notice was given to the creditors who filed their claims, and the cause being referred to the auditor, he stated and reported several accounts, marked " $F$, " " $G$," " $H$," " $K$," and " $L$."

By the order of the Circuit Court passed *pro forma*, "*Account L*" was ratified, and from that order these appeals were taken.

The claims of the appellants *Garrett & Sons, Drexel, Morgan & Co.* and *Joshua G. Harvey*, all had their origin in the dealings between the Garretts and Woods, Weeks & Co; these began, as it appears by the record, as early as 1875.

Woods, Weeks & Co. were merchants engaged in the business of importing and refining sugar, and had an account current with Robert Garrett & Sons, Bankers.

By an agreement between the two houses, Woods, Weeks & Co. had the privilege of overdrawing this account, by depositing with Robert Garrett & Sons, securities for advances made to them on their over-drafts. In compliance with this agreement Woods, Weeks & Co. deposited in February 1876, certain certificates of stocks, and bills receivable belonging to the firm or to the individual members, and also their own promissory notes; as these notes matured, they were either renewed or others substituted for them, and this was continued until the failure of Woods, Weeks & Co., July 23rd 1877.

The indebtedness of Woods, Weeks & Co. on their overdrawn bank account, was settled soon after their failure, by the collection of the collaterals which had been pledged as security. But there remained in the hands of Robert

Garrett & Sons four promissory notes of Woods, Weeks & Co. for $6000 each, deposited under the agreement before mentioned.

These, Robert Garrett & Sons claimed the right to hold, and to sell under the agreement, and on the 12th day of November 1877, sold the same to *Joshua G. Harvey* for $7740, and these constitute Harvey's claim, filed with the auditor.

By the agreement before referred to dated February 2nd 1876, it was stipulated, that the stocks, bills receivable, and promissory notes of Woods, Weeks & Co. were pledged as collateral security for "the payment of moneys advanced to Woods, Weeks & Co. in account, and for any indebtedness at present existing, or which may hereafter exist, with the understanding that if either of said loans, etc., or any one or more renewals thereof which may be made by Robert Garrett & Sons shall not be paid at maturity, the said Robert Garrett & Sons may, at any time thereafter, proceed to sell said stock and notes, at either public or private sale, or otherwise, without notice of time or place of sale for the purpose of satisfying said loans, etc. or renewals," with the privilege to Robert Garrett & Sons to purchase the same, discharged from any right of redemption.

And it was thereby further "understood and agreed, that any and all other securities belonging to Woods, Weeks & Co. now in the hands of Robert Garrett & Sons, shall be liable for any deficiency on account of this contract; and *any surplus from this contract, after settlement thereof, shall be applied to any indebtedness that may be due or become due to Robert Garrett & Sons.*"

In addition to the Bank account other transactions took place between the parties in the year 1877.

To enable them to make their several importations, Woods, Weeks & Co. obtained from Robert Garrett & Sons letters of credit, and to secure to the latter the pay-

ment of their acceptances, together with one per cent. commissions, Woods, Weeks & Co. entered into agreements, whereby the cargoes purchased with the credits so issued, were to be consigned to Robert Garrett & Sons, the bills of lading drawn to their order, and they were to have a specific lien upon the cargoes.

Four importations were made, viz., one by the "*Brig Addie Hale*," (No. 8 in the record,) upon which Robert Garrett & Sons issued a letter of credit for $50,000, on which Woods, Weeks & Co. valued to the amount of $40,000. One by the "*Brig Mary C. Mariner*," (No. 9 in the record,) upon which the letter of credit was for $50,000, on which Woods, Weeks & Co. valued to the amount of $28,000. One by the "*Brig Alice Bradshaw*," (No. 10 in the record,) on which the letter of credit was for $40,000, and the amount valued thereon by Woods, Weeks & Co. was $33,141.45, and one by the "*Houston*," (No. 28 in the record,) on which the letter of credit was for £10,000 sterling, and the acceptances thereon of Robert Garrett & Sons amounted in United States currency to $14,090.76.

This last cargo arrived after the failure of Woods, Weeks & Co., and was sold by Robert Garrett & Sons, consignees, the receipts therefrom more than reimbursed their acceptances on that account, and the surplus was applied to the credit of Woods, Weeks & Co.

With respect to the other importations, "Nos. 8, 9, 10," the course of dealing between the parties was as follows:

As the cargoes arrived before the acceptances of Robert Garrett & Sons matured, and Woods, Weeks & Co. desired to have possession of the same for their business operations, the merchandise was by agreement delivered to them, and in lieu thereof, and to secure to Robert Garrett & Sons the payment of their acceptances, Woods, Weeks & Co. deposited with Robert Garrett & Sons their own

promissory notes and certain collaterals, that is to say, in lieu of the cargo of the *"Addie Hale"* they deposited

Their own promissory notes, amount-
ing to..................................$40,000.00
And collaterals amounting to......... 20,240.00
                                       _____
                                       $60,240.00
In lieu of the cargo of the *" Mary C.
Mariner"* they deposited their own
promissory notes for..................$28,000.00
And collaterals for...................... 14,001.19
                                         _____
                                         $42,001.19
In lieu of the cargo of the *" Alice
Bradshaw"* they deposited their
own promissory notes...............$14,000.00
And collaterals for....................... 7,248.00
                                         _____
                                         $21,248.00

The several agreements under which the promissory notes and collaterals were deposited, and the merchandise delivered to the possession of Woods, Weeks & Co., each contained the same stipulations as those contained in the agreement of February 2nd, 1876, before recited, authorizing Robert Garrett & Sons to sell the promissory notes and collaterals in case of default, &c.

The promissory notes deposited under these agreements, fourteen in number, amounting to $82,000.00, remained in the hands of Robert Garrett & Sons at the time of the failure of Woods, Weeks & Co., and were by them sold to *Drexel, Morgan & Co.*, for $24,395. These notes constitute the claim of Drexel, Morgan & Co., filed with the auditor. When sold the notes were overdue.

It appears by the account of Robert Garrett & Sons, that Woods, Weeks & Co., owed them, at the time the

deed of trust was executed, July 24th 1877, a balance of $134,719.79.

For which they held

The promissory notes of Woods, Weeks & Co., $106,000.

Notes of other parties as collaterals, about $62,000.00, and the cargo of the Houston to arrive.

By receipts from collection of collaterals and sale of cargo of the Houston, the balance due Robert Garrett & Sons was reduced to $50,537.77.

This was the state of the account when the promissory notes were sold to Drexel, Morgan & Co., and Harvey.

Deducting the amounts realized from those sales, there remained a balance due Robert Garrett & Sons, including interest, of $19,313.90, and this constitutes the claim of Robert Garrett & Sons, filed with the auditor.

Thus while the real amount or balance due Robert Garrett & Sons was $50,537.77, there are exhibited accounts against the trust estate, claiming to share in the distribution, amounting to $126,250.40, which is the aggregate of the claims of Drexel, Morgan & Co., Harvey, and Robert Garrett & Sons, all growing out of the transactions between the latter and Woods, Weeks & Co.

Ought these claims to be allowed? As they arise out of, and depend upon, the rights of Robert Garrett & Sons, it becomes necessary in the first instance, to consider the nature and extent of their rights. If they had retained the promissory notes, and brought suit thereon they could recover no more than the amount of the debt actually due, which the promissory notes were given to secure. *Maitland vs. Citizens' Bank*, 40 *Md.*, 540, 570. As said in that case, while the Garretts were holders for value, they were only so to the extent necessary to protect the debts intended to be secured.

In that case the note of a third person was held as collateral; the same rule applies *a fortiori*, where the notes given in security, are those of the debtor himself. In a

suit upon such notes it is very clear no more than the real debt could be recovered.  The same rule would apply if the Garretts were here exhibiting the promissory notes, and claiming a dividend thereon against the trust estate; they would be allowed to prove for no more than the amount of the debt actually due.  In bankruptcy this rule has been settled by numerous decisions both in England and in this country.  The appellants contend that a different rule governs in Courts of equity, and have referred to several cases, all of which have been examined.

Among them the cases most relied on are *Re Barnerd's Banking Company, Kellock & Co.'s Claim*, and *Re the Xeres Wine Shipping Company, The Alliance Bank's Claim*, decided on appeal before the Lords Justices in 1868, and reported in 18 *L. Times R., N. S.*, 671.

Those cases were in equity, under what is known in England as "*the winding up Acts.*"  The *Xeres Wine Company* was in the course of liquidation.  The Alliance Bank was its creditor to the amount of £15,638 1s., and held certain Dock Wine warrants as security for the debt, with the right to sell the wine referred to in them to the amount of £12,000.  The winding up order was made in December, 1864.  In November, 1865, and later, the Bank sold wine sufficient to realize £12,000, and applied the proceeds in part payment of the debt.  The Bank claimed to prove for the full amount of principal and interest due them, notwithstanding the receipts from the sale of the wine; provided they should not be paid more than twenty shillings in the pound.

MALINS, V. C., decided that the Rule in Bankruptcy was applicable, and that the Bank was entitled to prove for no more than the balance due, after deducting the amount of proceeds of the sales.  18 *Law Times Rep., N. S.*, 177.  This decision was reversed on appeal, the Lords Justices deciding that the Alliance Bank was entitled to prove for the whole debt.

Trust Estate of Woods, Weeks & Co.

In the appeal of *"Barnerd's Banking Co.,"* which had been decided by the Master of the Rolls, in favor of the Bank, (Kellock claimants,) the decision was affirmed on appeal.

In these cases it was held,

*First,* That the time for computing the amount of the debt was the time when it was sent in under the general order ; and,

*Secondly,* That the creditor was entitled to prove for the whole amount of the debt then due, without reference to the value of the security or pledge then held, and which had not then been realized. The Rule in *Mason vs. Bogg,* 2 *Myl. & Cr.,* 443, was followed, and not that in *Greenwood vs. Taylor,* 2 *R. & Myl.,* 185.

The same principle was also decided, in the same year in *Midland Banking Co. vs. Chambers, Law Rep.,* 5 *Equity Cases,* 179. There the collateral security was a guarantee of a third person.

And also in *Ex parte Manchester and Liverpool D. Banking Co., Law Rep.,* 18 *Eq. Cases,* 249, decided on appeal in 1874.

In these cases the security held by the creditor was either property pledged, or the guarantee of third persons.

A case more analagous to the present was decided in 1869 by Lord ROMILLY, reported in 21 *L. Times R., N. S.,* 12, *in Re Blakely Ordnance Co., Ex parte the Metropolitan Bank,* which was a case in equity under the " Winding up Acts." There the Bank was creditor of the Blakely Ordnance Co., on its acceptances for £4000, and held as security 32 debentures of the company for £250 each, upon which the Bank sought to prove, but it was held that they were not entitled to prove for more than the £4000, the amount actually due. *Kellock's Case* was cited and considered, and his Lordship drew the distinction between that and the case before him. He says " *Kellock's Case* does not apply. I will give two or three instances to show what my mean-

Trust Estate of Woods, Weeks & Co.

ing is.   For instance, the Company owes the Bank £4000, for which they give a bill, and they execute a mortgage on White-acre.   There *Kellock's Case* applies.   Again, if the company owe £4000, and pledge 100 bales of cotton, then *Kellock's Case* applies; the Bank may sell the cotton for what it is worth and prove the whole debt.   I will go a step further.   I will assume that they have got thirty-two debentures in Company X, and that they pledge those.   Then *Kellock's Case* applies again.   The Bank may realize those debentures against Company X and prove for the whole of their debt.   But the present case is quite different.   Suppose that, in addition to the promissory notes for £4000, they give two other promissory notes for a similar amount, then *Kellock's Case* does not apply at all.   *   *   *   *   *   *   It is only one debt secured in various modes against themselves, and that distinction is perfectly plain, as it appears to me.   In every one of the cases which I have last put, you must prove against the company itself,   *   *   *   *   *   *   and you can only prove for the amount that is due."   *   *   *   *   He then adds, "It was very ingeniously suggested by Mr. Higgins in his argument, that they might sell the debentures; but the person to whom the debentures are sold and transferred, stands in no better position than the person who transfers them, in respect of that particular debt.   You cannot by selling or transferring these debentures to ten persons, multiply the proof ten times over.   You can only prove once for the debt."

This decision seems to me to be reasonable and just.   It is in harmony with *Rigby vs. Macnamara*, 2 *Cox*, 415, and *In re Oriental Bank, Ex parte European Bank, Law Rep.*, 7 *Ch. App.*, 99; in this case it was said by MELLISH, L. J.: "The principle itself, that an insolvent estate, whether wound up in chancery or in bankruptcy ought not to pay two dividends in respect of the same debt, appears to me to be a perfectly sound principle.   If it were not so, a creditor

could always manage, by getting his debtor to enter into several distinct contracts, with different people for the same debt, to obtain higher dividends than the other creditors, or perhaps get his debt paid in full. I apprehend that is what the law does not allow ; the true principle is, that there is only to be one dividend, in respect to what is in substance the same debt, although there may be two separate contracts."

And in *Third National Bank vs. Eastern R. R. Co.*, 122 *Mass.*, 240, which arose under an Act of the Legislature, providing for the payment of *creditors equally* out of the property and earnings of the Railroad Co., the same principle was decided. The Court say, " a debtor's liability to his creditors, where other creditors are concerned, is not increased by increasing the number of promises to pay the same debt, in whatever form he may make them."

The cases of *Regents' Canal Iron Works Company*, L. R. 3 *Ch. Div.*, 43, and *Morris' Canal & B. Co. vs. Fisher*, 1 *Stockton*, 667, cited by the appellants, in the re-argument do not seem to me to be in conflict with the rule before stated. The case in *Stockton* was referred to and considered by the Court in 122 *Mass.*, before cited.

Such being the rights of Robert Garrett & Sons as against the trust funds, I think " Account L " is correct so far as it allows a dividend only on the debt actually due from Woods, Weeks & Co., and which was secured by their promissory notes held by Robert Garrett & Sons. These notes were sold to Drexel, Morgan & Co. and Joshua G. Harvey ; the question next to be considered is, what rights did the parties acquire by the purchase ?

As to Drexel, Morgan & Co. These parties purchased the notes now held by them, after they were past due and dishonored ; they took them therefore subject to the equities inherent in them and then existing between the original parties, and acquired no better right against the trust fund than the Garretts could have asserted at the time of

the transfer. As the notes acquired by them were in part security for, and represented in part, the debt due the Garretts, they are entitled as assignees to a proportion of the dividend upon that debt.

It cannot be denied that this would be the measure and extent of their rights, if they held the notes merely as endorsees after maturity; but it is supposed that the power of sale, conferred on the Garretts by the original contract, and the execution of that power confers on the purchasers, different and better rights, and that they are entitled as purchasers to prove for the whole amount of the notes. It does not seem to me that this position is sound.

If the notes had been passed to a *bona fide* endorsee for value before maturity, the rights of the holder would be protected by the law merchant. But that is not the position of Drexel, Morgan & Co. They took them after maturity, with full knowledge of all the facts, and whether they acquired them by endorsement or by purchase from the Garretts, I think they can claim no greater or better right than could be asserted by the original holders.

With respect to the claim of Joshua G. Harvey, I have reached the conclusion, after a careful examination of the proof contained in the record, that he stands in no better position than Drexel, Morgan & Co. He purchased the notes before their maturity, but under circumstances which, in my judgment, charge him with notice of the infirmity in the paper, and deprive him of the protection which the law throws around an innocent endorsee without notice.

It is not necessary, in order to impeach the title of the endorsee to prove express notice or knowledge. If the facts are such as necessarily to cast a shade on the transaction, and to put him on inquiry, the knowledge will be imputed to him. *Story on Prom. Notes, sec.* 197; *Magruder vs. Peter*, 11 *G. & J.*, 217; *Price & Bevan vs. McDonald*, 1 *Md.*, 403; *Smoot vs. Andrews*, 19 *Md.*, 398; *Green vs. Early*, 39 *Md.*, 223.

In my opinion Account L is correct in so far as it allows a dividend upon the actual debt due from Woods, Weeks & Co. to the Garretts, and distributes that dividend between the Garretts, Drexel, Morgan & Co. and Harvey, in the proportion between the balance due the Garretts, and the notes held by Drexel, Morgan & Co. and Harvey who claim as assignees.

Entertaining these views, I respectfully dissent from the opinion of the majority of the Court.