HARRISON WAGNER *vs.* GEORGE W. SHANK and
MARGARET, his Wife, administrators of WILLIAM
SHANK. SAME *vs.* NOAH FLECKINGER and ELIZA-
BETH P., his WIFE. SAME *vs.* THE ADAMS EX-
PRESS COMPANY. SAME *vs.* OTHO A. SHANK and
ELIZABETH, his Wife, &c. SAME *vs.* CALVIN S.
BURRIER. SAME *vs.* JACOB M. NEWMAN. SAME
*vs.* ESAU D. CREAGER and ELLEN, his Wife. SAME
*vs.* GEORGE P. BARRICK. SAME *vs.* WILLIAM
CARMACK and MARGARET, his Wife. SAME *vs.*
CHARLES and WILLIAM SLAGLE. SAME *vs.* JOSEPH
and GEORGE W. McCOSKERY. SAME *vs.* FRANCIS
G. and OTHO J. DONSIFE. SAME *vs.* JOHN M.
HOLBRUNNER and CATHARINE E., his Wife. SAME
*vs.* MOSES ANDERS and others. SAME *vs.* JOHN A.
SNYDER, and CHARLES H. KRISE. SAME *vs.* JAMES
M. SMITH. SAME *vs.* SAMUEL F. THOMAS.

*When Equity will give relief by Restraining the execution of*
*Judgments at law—How Corporation, incorporated under the*
*laws of the State of New York, and doing business in Mary-*
*land, shall be Summoned when sued in the latter State—Act*
*of 1868, ch. 471, secs. 209, 211—When a Court of Equity*
*has jurisdiction to Perpetually enjoin the execution of Judg-*
*ments at law.*

Where a party fails to avail himself of his proper defence at law, and
is not prevented from so doing by fraud or accident, or the acts of
the opposite party, unmixed with any negligence or fault on his
part, equity will not interfere. But where a party is not in fault
by failing to use reasonable diligence, and is prevented from de-
·fending the action at law by fraud or accident, or the acts of the
opposite party, equity will lend its aid and give relief.

Sundry parties were sued before a magistrate, and upon being summoned, promptly employed counsel to attend to the suits. The counsel so employed, went to the residence of the magistrate, and after some conversation with him, the magistrate concluded to dismiss the cases, and then signed, sealed and delivered to the counsel a paper in which he stated that "having become perfectly satisfied that the suits brought before me by H. W. against the following persons, to wit: (naming the defendants,) are vexatious, and without any color of claim or right, the same are hereby dismissed." The counsel took this paper and gave it to one of his clients, and informed all of them that the suits had been dismissed. Shortly afterwards, without notice to the counsel or to any one of the defendants, the magistrate proceeded to enter up the judgments on his docket. No execution was issued upon any one of these judgments, until long after the time for appeal had elapsed; and neither the defendants, nor their counsel, had any knowledge of such judgments until nearly a year after they had been rendered. HELD :

That the foregoing facts abundantly justified the interposition of a Court of equity to relieve by perpetually enjoining the execution of the judgments.

Where a corporation is incorporated under the laws of the State of New York, and transacts business in Maryland and in Frederick County, and has a principal office in Maryland, located in the City of Baltimore, and suit is brought in Frederick County against such corporation by a resident of the State of Maryland, and summons is duly served upon an agent of the corporation in said county, it is essential that notice of such process should be left at the principal office of said corporation in the City of Baltimore, and without such notice the service is incomplete and ineffectual, and the corporation is not summoned.

Where a Court of equity has power to order the delivery up and cancellation of judgments at law, there can be no question as to its power to perpetually enjoin their execution.

APPEALS from the Circuit Court for Frederick County, in Equity.

The cases are stated in the opinion of the Court.

The causes were argued before MILLER, YELLOTT, STONE, ALVEY, ROBINSON, and IRVING, J.

*John H. Handy,* for the appellant.

*Frederick J. Nelson,* for the appellees.

MILLER, J., delivered the opinion of the Court.

In these seventeen cases appeals have been taken by Harrison Wagner, from the same number of decrees of the Circuit Court for Frederick County, sitting in equity, perpetually enjoining the execution of a large number of magistrates' judgments, rendered in his favor against the several appellees. They present, as a whole, a case without precedent in judicial annals. They show the rendition of *one thousand two hundred and ninety-six* magistrates' judgments, amounting in the aggregate, to *one hundred and twenty-seven thousand, eight hundred and thirty-six dollars* debt, and *two thousand three hundred and forty-eight dollars and ten cents* costs, in favor of the appellant. They were all rendered by *John A. Wilson* and *John H. Locke,* two justices of the peace, in Frederick County, *seven hundred and ninety-one* of them by the former, and *five hundred and five* by the latter. Eight hundred and sixty-two are for the exact sum of ninety-eight dollars each, four hundred and thirty-two for one hundred dollars each, and two for eighty dollars each. The bills in these cases were filed by the twenty-seven defendants in these judgments, praying for injunctions to restrain the enforcement of them, and that the same may be cancelled or otherwise dealt with as right and justice may require.

1st. With respect to the judgments rendered by Wilson, the bills charge, in substance, that Wagner, maliciously and wickedly designing and intending to cheat, defraud and swindle the complainants out of large amounts of money, procured these judgments to be entered up by Wilson, who was falsely and unlawfully pretending to be a justice of the peace, but who in fact, at the time, had no authority to act as such; that neither at the time of the

institution of the pretended suits, nor at the time when the pretended judgments were rendered, were the complainants indebted to Wagner in any sum of money whatever, and that the same as well as any pretended claims upon which they may be founded, are wholly false, vexatious and oppressive, and without any pretence or color of right or justice; and that the complainants had no knowledge of their existence, until nearly a year after they were rendered. Interlocutory decrees for want of answers were entered in all the cases except one, and testimony under *ex parte* commissions was taken by the complainants. Wagner, however, subsequently filed his answers, in which he denies all the allegations of fraud contained in the bills, avers that the several complainants were duly summoned in the cases before the magistrate, who, he insists, was duly authorized to act as such at the time, declares that the judgments are genuine, valid and effective, and admits that at the time of the filing of the bills it was his purpose and intention to enforce them. Other commissions were then issued under which testimony was taken on the part of the defendant, and in some of the cases also by the complainants.

The gross iniquity of this whole transaction, manifest enough upon its face, is abundantly established by the proof. Wilson lived in a different district of the county and at a place remote from that in which the parties sued resided, and these seven hundred and ninety-one judgments, were rendered by him on fourteen different days from the 30th of September, to the 26th of December, 1878, all of them, save sixty, in the month of October, and as many as two hundred and forty-two on one day in that month. The inference is irresistible that he merely wrote them out on his docket, without examining witnesses, and without the semblance even of an *ex parte* trial. The claims on which they are founded do not appear in the records, but it is impossible to conceive that

Wagner could have had this number of separate *bona fide* claims against these parties, each for the exact sum either of $100, or of $98. It would be taxing credulity beyond all reasonable limits to ask any one to believe that such a set of claims ever grew out of honest dealings. But the complainants all testify that they never owed the man a cent, that they never had any business transactions with him, and some of them swear that they never knew that such a person existed. In one case the bill is filed by administrators, who would not be competent to testify, but the facts, that the intestate never had any dealings with Wagner, and was never indebted to him, are sufficiently established by other competent witnesses. He did not come forward to testify in his own behalf, in any of the cases. In one (that of Otho A. Shank and wife,) he was summoned by the complainants, but he refused to be sworn until the interrogatories were written out and filed with the commissioner, and a copy thereof furnished to him. Being gratified in this to the extent of having the interrogatories filed, he was examined, and when asked what was the foundation of the twenty judgments, of $100 each against these parties, all he could say was, that Shank and wife, closed up a drain in the main street, in the town of Woodsboro', by which act he *considered* his property there was injured to the extent of $2000, and that he divided this up into twenty suits, in order to bring them before a magistrate, so as to end the matter in a short time. He could not tell however, when the drain was thus obstructed, and Shank swears that neither he nor his wife, ever at any time placed any obstructions therein.

In regard to this testimony it is enough to say that it clearly shows there was no real foundation for the judgments in this particular case. In none of the others was any attempt made to contradict the positive and direct testimony of the complainants to the same effect. But the appellant by his counsel insists, that all this proof is

*immaterial*, that the complainants were duly summoned
and should have defended the suits before the magistrate,
that not having done so, and not having appealed there-
from, the judgments are now conclusive, and the rule is
inflexible, that in such a case a Court of equity has no
power to interfere.   By taking this defence, he admits, in
effect, that he is content to enrich himself, and inflict
heavy loss, if not ruin, upon these parties, by holding on
to and enforcing judgments, which are conclusively proved
to be utterly unjust, and which in fact, represent no real
debts whatever.   But assuming that these cases, extraor-
dinary and unprecedented as they are, cannot be treated
as constituting an exception to the general rule, there is,
fortunately for the ends of justice, proof enough in the
records, to exempt them from its operation.   The rule is
that where a party fails to avail himself of his proper de-
fence at law, and is not prevented from so doing by fraud
or accident, or the acts of the opposite party, unmixed
with any negligence or fault on his part, equity will not
interfere.   *Gott & Wilson vs. Carr*, 6 *G. & J.*, 312; *Kirby
vs. Pascault*, 52 *Md.*, 536.   But this rule in terms recog-
nizes the doctrine, which is equally well settled, that where
a party is not in fault by failing to use reasonable dili-
gence, and *is* prevented from defending the action at law,
by fraud or accident, or the acts of the opposite party,
equity will lend its aid and give relief; and the proof
shows that the complainants in all the cases involving
these Wilson judgments, except two, are entitled to relief
upon this ground alone.

When these complainants were summoned they promptly
employed counsel to attend to the suits.   Mr. Nelson, the
counsel so employed, testifies that shortly after his employ-
ment he went to Wilson's residence, and after some conversa-
tion with him, Wilson concluded to dismiss the cases, and
then signed, sealed and delivered to witness a paper in which
he states that " Having become perfectly satisfied that the

Wagner *vs.* Shank and Wife, Adm'rs, *et al.*

suits brought before me by Harrison Wagner against the following persons, to wit : "   (Then follow the names of all these complainants except Otho A. Shank and wife and John M. Holbrunner and wife, with the number of cases against each,) " are vexatious and without any color of claim or right, the same are hereby dismissed." He then took this paper, gave it to one of his clients and informed all of them that the suits had been dismissed. Having obtained this order of dismissal he supposed the matter was finally disposed of and gave himself no further concern about it. But shortly afterwards, without any notice to Mr. Nelson, or to either of the complainants, Wilson proceeded to enter up the judgments on his docket. A case of grosser misconduct on the part of a magistrate in the discharge of his judicial duties can hardly be imagined. But when this is followed by the fact that Wagner never issued execution upon a single one of these judgments, amounting in the aggregate to more than $75,000, until long after the time for appeal had elapsed, and by the further fact that neither the defendants in them, nor their counsel, had any knowledge of such judgments until nearly a year after they had been rendered, the inference may be justly drawn that Wagner and Wilson acted in collusion for the fraudulent purpose of having these judgments rendered *secretly,* and their existence *concealed* in order to prevent any appeals therefrom. These facts alone make a plain case for relief in equity.

In the two cases of Shank and wife, and Holbrunner and wife, there were twenty judgments, amounting to $2000 against the former, and ten, amounting to $1000 against the latter. Shank and Holbrunner both testify in clear and positive terms, not only that they were never indebted to Wagner, but that neither they nor their wives *were ever summoned* to appear before Wilson in these suits. Under the peculiar circumstances of these cases we are convinced that their testimony on this point must be taken as true.

notwithstanding the testimony of Grimes to the contrary and his returns to the writs. It appears that Grimes was the constable to whom a very large number of the summonses in these cases were entrusted for the purpose of being served, and it is not strange that he should have been *mistaken* as to service in these two instances. But as to the defendants the case was quite different. The suits were for large amounts, unusual in number, and for these reasons, if for none other, extraordinary in character.. If the defendants had been summoned in such cases the fact was one most likely to be impressed on their memories, and it would be strange if they had neglected to attend to them. The very fact that they did not do so and did not employ counsel as did their neighbors, who had been summoned in precisely similar cases, is a circumstance which tends strongly to corroborate their testimony. Finding then that these parties were never summoned it is hardly necessary to say that the judgments against them are absolutely void.

These views dispose of all the judgments rendered by Wilson, and dispense with the necessity of deciding the further question whether his term of office had then expired, so that he was not authorized to act as a justice of the peace.

2nd. As to the judgments rendered by Locke, the bills contain similar averments of fraud, and the answers the same general denials. There is here, however, no question as to the facts that Locke was, at the time, duly commissioned, and had duly qualified by taking the requisite oath at the proper time. The case of greatest importance is that of Adams Express Company, and a most remarkable one it is. In the first place, Wagner, on the 31st of March, 1877, instituted *one hundred and nineteen* suits against this company before this magistrate for $100 each. On the 14th of April, the trial day, Mr. Nelson, as counsel, and an agent of the company appeared at the magistrate's office

to contest the cases, but found that Wagner had been there the day before and *withdrawn* them, saying (as Locke testifies) that he was not able to attend to them at that time. On the 21st of April, seven days after these suits had been thus withdrawn, he instituted *five hundred* other suits, each for the sum of $98, and on the 13th of October following, judgments were entered up in each of these cases for $98 debt, and $2.50 costs, making in the aggregate $49,000 debt, and $12.50 costs. The causes of action are all of the same character and in the same words, viz., "for the fulfilment in payment of the *first* part of your indebtedness $98," and so on for the following and consecutive *parts* up to five hundred. The magistrate himself proves that there were no affidavits to these claims, that Wagner never swore to their correctness, that no witnesses were examined in reference to them, that neither party was present in person or by counsel when the judgments were rendered, and that he entered them all up on the same day. It is hardly possible to believe that one who had held a commission as justice of the peace for more than thirteen years, could be so ignorant as to do such an act. The law makes the path of his duty exceedingly plain. When the summons is returned " summoned," and the defendant fails to appear, the justice must fix a day of *trial* within a prescribed time, and on the day so fixed he may proceed to *try* the case *ex parte.* Either party may ask a postponement, and he is required to postpone the *trial* to another day, if he is satisfied by the oath of the party making the application, or otherwise, that a postponement is necessary to a fair *trial* of the case. If either party fails to appear on the day to which the case is thus postponed, he may proceed to *try* the case *ex parte.* And in all cases *tried* before him he may enter judgment against either plaintiff or defendant for such sum as may appear to him just and right. *Code, Art.* 51, *secs.* 19, 23, 24, 30. All these provisions of the Code contemplate, and require a *trial,* and

in an *ex parte* trial where the plaintiff claims a judgment, especially in cases like the present, upon mere open accounts, not even supported by his affidavits, he must prove his claim either by his own testimony or that of other witnesses, before the magistrate can rightfully give judgment in his favor. If these suits had been brought, as they might have been, in the Circuit Court, and the summonses had been properly served, interlocutory judgments for want of an appearance would have been entered, but before they could have been extended and made final, the plaintiff would have been compelled to prove his accounts by competent testimony. Judgments entered up as these were are simply shams, mere attempts to create debts by the forms of law where none were ever proved to exist, or where none in fact ever existed.

What would be the effect of a failure to appeal from such judgments, need not now be decided, for there is another fact in the case, which makes them void. The proof shows that this company was incorporated under the laws of the State of New York, that it transacts business in Maryland, and in Frederick County, and that it has a principal office in this State, which is located in the city of Baltimore. It is, therefore, a corporation not incorporated under the laws of this State, but holding and exercising its franchises therein, and the suits against it are by a resident of this State. In such cases the law expressly provides, that "in case of service of process on an agent, *notice* of such process *shall be* left at the principal office of said corporation, if there be such office in this State." *Act of* 1868, *ch.* 471, *secs.* 209, 211. Now assuming that the summonses in these suits were duly served upon Renner, the agent of the company, in New Midway, in Frederick County, and that he was a proper party to receive and accept such service, as well as the agent in Frederick City, still the proof is clear and undisputed, that no *notice* of such process was ever left at or sent to the principal office.

in Baltimore. In this respect the plain requirements of the law have not been complied with. The leaving of this notice at its principal office in this State, is made an essential part of the service of process upon such foreign corporations, and for reasons too obvious to need explanation. Without it the service is incomplete and ineffectual, and the corporation is not summoned. These judgments, therefore, having been rendered before the defendant corporation had been legally summoned, are void.

In the case of Calvin S. Burrier, there were three judgments against him for $100 each, rendered on the 25th of September, 1880, by the same magistrate, with like absence of parties and proof, and in the same manner, that those against the Express Company had been entered. At the same time that the summonses in these cases were issued, there were also issued three summonses in attachment at suit of Wagner, use of Frew against Burrier, as garnishee of Mary Murphy. Both sets were returnable on the same day, the 18th of September, and on the morning of that day, Burrier and Wagner both appeared before the magistrate, and the attachment cases were then tried. Upon the testimony of Burrier that he was not indebted to Mary Murphy, and had no credits belonging to her in his hands these cases were *non-prossed.* At this time, both parties being present, the other cases, those in which the judgments in controversy were rendered, stood for trial, but not a word was then said to Burrier about them, either by Wagner or Locke, and the latter, in the afternoon of the same day, and after the parties had left, entered the cases continued until the 25th of September, when the judgments were entered up as before stated. In view of these facts, and of this conduct on the part of Wagner and the magistrate, we are quite ready to accept as true the positive testimony of Burrier, that no summonses were ever served upon him in these cases. Grimes is far from being clear in his recollection on this point, and it may well be, that

while he served the three summonses in the attachment cases, he failed to do so as to the three in the debt suits. We have, therefore, no hesitation in pronouncing these judgments void, because the defendant was never summoned. In other respects, this case differs from the others only in the fact that, Wagner was again called as a witness, by the complainant. When first summoned he refused to testify, and the commissioner certified the fact to the Court. By order of Court he was re-summoned and he then submitted to testify, but utterly failed to prove that he had any just claim against Burrier. He said that Samuel T. Murphy was indebted to him, and that Burrier was Murphy's trustee, and as such had money or property belonging to Murphy in his hands. But Burrier swears that he never was such trustee, and never had any such money or property in his possession. At one time he sold under a chattel mortgage, the property of Susan C. Murphy his wife, and paid all the claims against her estate, but never paid any thing to any one that Samuel T. Murphy owed.

The case of Dr. Samuel F. Thomas is the last in the series, and in some respects differs from all the others. There were two judgments against him for $80 each, rendered on the 10th of September, 1877, in suits brought on the 1st of that month. The causes of action are in precisely the same form as those in the Express Company's case, and Dr. Thomas is equally positive in his testimony, that he was never summoned, and was not indebted to Wagner, "one cent or any fraction of a cent." He says, he was summoned before Locke in the spring of 1877, when he appeared and the case was tried, and a judgment rendered in his favor against Wagner. Locke was not a witness in the case, but Wagner was, and so far as his testimony can be relied on, makes a better showing of something actually due to him. But the distinguishing feature of the case is that the suits were brought, and the

judgments rendered against *S. F. Thomas,* and when Wagner brought one of the judgments to justice Mahoney to have an execution issued upon it, he was informed that if it was issued in that name, he might be restrained from enforcing it, to which he replied, "very well, I have got enough of them at home." Rine, the constable who levied the execution, testifies that when he first saw the judgment in Mahoney's office, it was against *S. F. Thomas,* but when he afterwards received it from Locke, the name was written *Sam. F. Thomas,* and that after he had made the levy, he saw Wagner who insisted he should say nothing about the change of the name of Dr. Thomas in the judgment. This seems to be conclusive proof that the name was thus changed by Wagner, long after the judgment was rendered, and shortly before the *fieri facias* was issued. In fact in this enormous manufacture of judgments, it is plain that this man stopped little short of actual forgery, and we agree entirely with the learned Judge of the Court below, that even these two judgments are so polluted with fraud, that they also must be enjoined.

This disposes of the judgments rendered by Locke, and we leave them with the remark, that here, as in the case of those rendered by Wilson, the parties affected had no knowledge of their existence, and no attempt was made to execute them, until long after the time for appeal had passed. On this point the testimony in all the cases is the same and is conclusive.

3rd. As to the jurisdiction of a Court of equity to pass the decrees appealed from we entertain no doubt. There are prayers in most of these bills, not only that these judgments may be perpetually enjoined, but that they may be cancelled. In discussing the question, how far Courts of equity ought to interfere in requiring void deeds and other instruments to be delivered up or cancelled, Judge STORY says: "Whatever may have been the doubts or difficulties formerly entertained upon this subject, they

seem by the more modern decisions, to be fairly put at rest, and the jurisdiction is now maintained in the fullest extent. And these decisions are founded on the true principles of equity jurisprudence, which is not merely remedial, but is also preventive of injustice. If an instrument ought not to be used or enforced, it is against conscience for the party holding it to retain it; since he can only retain it for some sinister purpose." 1 *Story's Eq., sec.* 700. If then, the Court would have power to order the delivering up and cancellation of these judgments, there can be no question as to its power, to perpetually enjoin their execution.

4th. In the cases in which interlocutory decrees were obtained the appellant filed petitions asking that they be stricken out, and that he be permitted to demur to the bills. In these petitions he states that he instructed his solicitor, Wm. P. Maulsby, Jr., to prepare and file the appropriate pleadings, but finding delay in this he made inquiry on the subject, and Mr. Maulsby informed him that he had an agreement in writing with Mr. Nelson, the complainants' solicitor, that no interlocutory decrees should be taken and hence no harm would ensue from the delay; that he again urged him to file the proper pleadings and demand injunction bonds, which he failed to do, and finally, because of urgent demands upon him to take such action, he withdrew from the cases, so that the petitioner was compelled to employ another solicitor, which he immediately did, and the solicitor so employed advised him to demur to the bills. The petitions also contain other charges, to the effect that Mr. Maulsby had acted in collusion with Mr. Nelson to have the matter so fixed that his new counsel could do the petitioner no good. In reply, both these gentlemen filed affidavits in which they deny that any such agreement as is alleged in the petitions was ever made, denounce this and the other charges against them as wickedly and maliciously false, and on motion the

Court ordered so much of the petitions as assails their personal or professional conduct to be stricken out as impertinent and scandalous.   The Court also refused the application to strike out the decrees, as well as the prayer for leave to file demurrers, and dismissed the petitions.

The appellant insists there was error in this order and that he was entitled as matter of right to demur to the bills, notwithstanding the interlocutory decrees. The ground taken by his counsel is that the term " answer " in sec. 117, Art. 16, of the Code, which allows a defendant, against whom an interlocutory decree has been passed, to appear at any time before final decree " and file his answer on oath to the bill," includes a demurrer, and that a demurrer is an answer within the purview of this section.   He insists that this is a most important question of chancery practice, and that it is absolutely necessary that it should be decided in these cases.   The importance of the question may be conceded, but we do not agree with counsel as to the necessity of its being now decided, and for the plain reason that the appellant has suffered no injury, even if there was error in the Court's refusal to allow him to demur.   Such demurrers, if they had been filed, ought at once to have been overruled.   The Court, as we have said, had jurisdiction, and each bill states a case entitling the complainant to the relief prayed.   In our opinion an answer to the merits was the only defence he could rightfully make.   Why, then, should the decrees be reversed and the cases remanded in order to allow him to demur? The only practical result of such a proceeding, besides delay, would be that he would be compelled to pay, by way of fine, the sum of ten dollars to the complainant in each of these cases upon the overruling of his demurrers. *Code, Art.* 16, *sec.* 102.   It is true, he may, by reason of his fraudulent conduct, richly deserve to be mulcted in these sums, but it cannot be said he would be benefited, in a legal sense, by being required to pay them now, or

that he has been injured because he has not had an oppor-
tunity of paying them before.

For the same reason it is wholly unnecessary to deter-
mine whether the charges made in these petitions against
Mr. Nelson and Mr. Maulsby were "impertinent and scan-
dalous," as these terms are defined in the books on Chan-
cery Practice.   The Court was clearly right in refusing,
as it practically did, to regard these charges after they
had been proved by the affidavits of the gentlemen against
whom they were made, to be utterly false and unfounded,
as any ground for setting aside the interlocutory decrees,
and this is all the notice that need be taken of this matter.

5th. He also filed petitions asking for injunction bonds,
but the Court dismissed them, saying that upon the facts
set out in the bills and sworn to, the cases were not such
as to require bonds.   There is no statute which expressly
directs that a bond shall be given before an injunction to
stay execution of a judgment can be issued.   The matter
is left to the discretion of the Court, but the practice has
universally prevailed to require such bonds save in ex-
treme and exceptional cases, and generally in double the
amount of the judgment sought to be restrained, as was
once provided by the old Act of 1723, ch. 8, sec. 5.   We
cannot review the decisions of the Court below that these
were exceptional cases in which the ends of justice author-
ized a departure from the general and salutary rule.   The
appellant, however, has suffered no harm from this action
of the Court, for the proceedings have resulted in decrees
making the injunctions perpetual, which would have the
effect to discharge the bonds if they had been given.

He also in one case demanded that the commission con-
taining the testimony taken under the interlocutory decree
should be opened, and the testimony submitted to his in-
spection, but the Court refused to allow this to be done
until he had first obtained leave and had actually filed
his answer.   We cannot perceive how he has been pre-

judiced by this refusal.    If he desired to inspect this testimony in order to frame his answer so as to meet it, he clearly had no right to examine it for that purpose.    He had no intention of allowing the case to be submitted for final decree on this testimony without answering ; and he did not, therefore, desire to examine it in order to file exceptions to it, before such decree could be passed.    He had already prepared his answer, and on the same day on which the demand for the opening of the testimony was made, delivered it to the clerk, to be filed as soon as the Court's decision in reference to the striking out of the interlocutory decree should be rendered.    He afterwards applied for and obtained leave to answer and his answer was filed. After this the testimony was opened and he had ample opportunity in this, as well as in all the other cases, to meet the *ex parte* testimony by any testimony he could adduce, and also to sustain the defences taken in his answers.    We have carefully examined all the testimony he has produced in each of these cases without regard to any exceptions filed to it, and find that it utterly fails to break the weight of the overwhelming proof offered by the complainants.    By that proof a monstrous fraud has been exposed.    The victims have sought relief in the only tribunal to which they could resort.    The strong arm of a Court of equity has protected them, and the decrees in their favor will be affirmed.

*Decrees affirmed.*

(Decided 2nd February, 1883.)