THE FIRST NATIONAL BANK OF ST. MARY'S *v.*
ALMA B. TODD

[No. 86B, September Term, 1977.]

*Decided July 18, 1978.*

The cause was argued before MURPHY, C. J., and SMITH,
LEVINE, ELDRIDGE, ORTH, and COLE, JJ.

*Robert Dale Klein,* with whom were *Edward S. Digges, Jr.,*
and *Piper & Marbury* and *William Aleck Loker,* General
Counsel, on the brief, for appellant.

*Henry F. Leonnig* for appellee.

SMITH, J., delivered the opinion of the Court.

Appellee, Alma B. Todd (Mrs. Todd), sued appellant, The First National Bank of St. Mary's County (the Bank), and one of its employees for malicious prosecution. A Calvert County jury returned a verdict of $4,000 for compensatory damages against both defendants and $8,000 punitive damages against the Bank. Only the Bank appealed. We granted the writ of certiorari before the matter was heard by the Court of Special Appeals.

The sole question presented, as framed by the Bank, is whether "it [is] against public policy to submit to a jury the issue of punitive damages in a suit for malicious prosecution where the only evidence of malice in fact is that which might be drawn through an inference upon inference traceable to the fact that a criminal proceeding initiated by [the Bank] terminated in favor of [Mrs. Todd]." We find that this issue has not been preserved for appellate review.

We relate the facts of the case only because they may have relevance to a clear understanding of the issues presented in a companion case, *The First National Bank of St. Mary's v. Fidelity & Deposit Company*, 283 Md. 228, 389 A. 2d 359 (1978). Mrs. Todd's husband is engaged in the home construction business. She is the only person authorized to draw checks on behalf of his business. On December 20, 1974, a Friday, she drew a check to a roofing subcontractor. The following day she received a telephone call from her bank indicating that he had made an attempt to cash the check. On Monday, after a discussion with the branch manager of her bank, a stop payment order was issued. On December 31 she received a telephone call from the appellant Bank. Her version of the conversation is:

> "On the last day of December of that year I got a call from some representative of St. Mary's Bank that told me that Federal Auditors were in their bank at that time.
>
> "Q. You say Federal Auditors?
>
> "A. Yes. Federal Auditors were in the bank at that time and I had done an illegal thing that could

cause me grave legal harm. That was the term they used, grave legal harm. And that the bank needed something in exchange for that check that day. I told them I did not have the cash. Even if I had it I didn't have time to bring it down that day. They indicated to me could I write — asked me if I could write another check. I said certainly I could do that but it wouldn't be any good. If I didn't have the cash I also didn't have the twelve hundred, that the check wouldn't be any good. They said that couldn't be important just as long as they had a negotiable piece of paper with a current date in their file, that that would be sufficient to satisfy the auditors, that the stop payment check was absolutely worthless and they did not have —

\* \* \*

"A. Or they would have it or at least they would have a negotiable piece of paper. I said I had stopped payment on the check because I didn't feel like I [owed] the man twelve hundred dollars, but I estimated that a rough guess of how much we would be out insurance wise when our books were audited and we had to settle up with our Workman's Compensation people. It would be in the neighborhood of two hundred dollars. I asked if I could write the check for a thousand and he said no, it had to be a duplicate of the previous written check. I was still saying no, I didn't see what good that would do, that I did not have the money in the bank, what was the sense of writing the check. He said again, whoever I was talking to, that it wouldn't make any difference as long as they had a negotiable piece of paper and they would hold it. When would the check be good. I said I didn't know, my husband had yet to bill the customer. That if they would hold it, if they agreed, I would let them know when it would be negotiable. I don't know if I mentioned it,

> I estimated about a week or more. And I was explaining to them I was unable to bring anything down to St. Mary's County. I could not do it at the time and it was suggested that I leave a check in the amount of twelve hundred dollars made out to A. A. Milburn [, the roofing subcontractor,] and the First National Bank of St. Mary's County with the representative at my bank in La Plata and that a representative from the National Bank of St. Mary's would be down to pick the check up and leave in exchange the stop payment check."

She drew the check as requested, but it was not held.

Acting through its assistant branch manager, the Bank obtained a warrant for the arrest of Mrs. Todd on January 13, 1975. The application recited that Mrs. Todd had committed a crime by the following facts:

> "Check # 140 for 1,200.00 Dollars presented to First Nat'l Bank of St. Mary's, Lexington Park, Md., to replace check for same amount being held by bank for reason of stop pay't. Check drawn on Maryland Bank & Trust, Waldorf, Md. Check returned for nonsufficient funds."

The warrant was issued out of the District Court of Maryland in St. Mary's County. Judge Harkness of the District Court heard the case and found Mrs. Todd not guilty. He pointed out that, taking the evidence in the case in its most favorable light on behalf of the State, the testimony of the first witness was to the effect that when Mrs. Todd gave him the check she told him that it was of no value, that she did not have sufficient funds, but that if he held it until January 8 it would be good. The check was not held and the warrant was issued on January 13. The judge observed that "if they agreed to hold the check until January 8th and under the statute any time with[in] ten days thereafter if the defendant had deposited funds sufficient to cover that amount there could have been no prosecution . . . ." His second reason for the judgment of acquittal was that he was "unable to find that

the defendant obtained anything of value from the First National Bank." *See State v. Sinclair & Sinwellan Corp.,* 274 Md. 646, 660, 337 A. 2d 703 (1975).

The Bank argues, citing *Stansbury v. Luttrell,* 152 Md. 553, 561, 137 A. 339 (1927), and numerous other cases that "[i]t is the avowed public policy of the State of Maryland to encourage its citizens to report crimes and bring offenders to justice." It calls attention to the fact that we have referred to the tort of malicious prosecution as "not a favorite of the law." *Exxon Corp. v. Kelly,* 281 Md. 689, 693, 381 A. 2d 1146 (1978). It says that in no other intentional tort is a plaintiff permitted "to go to the jury on the issue of punitive damages unless there is evidence of at least gross or wanton conduct ('legal malice')," citing *General Motors Corp. v. Piskor,* 277 Md. 165, 352 A. 2d 810 (1976) (false imprisonment, assault and slander); *Vancherie v. Siperly,* 243 Md. 366, 221 A. 2d 356 (1966) (malicious or wanton infliction of personal injury); *Nichols v. Meyer,* 139 Md. 450, 115 A. 786 (1921) (trespass de bonis asportatis); *Wedeman v. City Chevrolet Co.,* 278 Md. 524, 366 A. 2d 7 (1976) (deceit-misrepresentation); *Summit Loans, Inc. v. Pecola,* 265 Md. 43, 288 A. 2d 114 (1972) (invasion of privacy); and *GAI Audio of N.Y. v. C. B. S.,* 27 Md. App. 172, 340 A. 2d 736 (1975) (unfair competition). It points out that a plaintiff "in a malicious prosecution case, however, need only demonstrate a want of probable cause, i.e., that the defendant's suspicion of the plaintiff's guilt was merely *unreasonable.*" (Emphasis theirs.) From this the argument is constructed that "permitting punitive damage awards to be predicated upon 'malice' inferred from a want of probable cause [is] inconsistent with the malice standard set up by this Court for torts in general and, more importantly, inconsistent with this Court's traditional rule that malicious prosecution suits are disfavored in the law."

The Bank's argument is made in the face of the flat holding in *Safeway Stores, Inc. v. Barrack,* 210 Md. 168, 177, 122 A. 2d 457 (1956), repeated in *Montgomery Ward & Co. v. Keulemans,* 275 Md. 441, 448, 340 A. 2d 705 (1975), that punitive damages could be recovered in a malicious prosecution action if a jury found "a want of probable cause,

plus malice, but that malice might be inferred from a want of probable cause." Our prior holding may not be the majority rule, however, since 52 Am. Jur.2d *Malicious Prosecution* § 94 (1970), states that "[e]xemplary damages may be awarded [in malicious prosecution actions] when there is proof of actual malice," and that "[t]he general rule appears to be that such damages may properly be assessed where the defendant's act was wilfully done, in a wanton and oppressive manner and in conscious disregard of his civil obligations." *Cf.* Restatement (Second) of Torts § 908 (Tent. Draft No. 19, 1973) ("Punitive damages may be awarded for **conduct which is outrageous . . . .**").

By Maryland Rule 885 we do "not ordinarily decide any point or question which does not plainly appear by the record to have been tried and decided by the circuit court . . . ." In this case a motion for a directed verdict was made by the defendants at the end of the plaintiff's case on the ground that the defendants were acting on the advice of counsel (*See Gladding Chevrolet v. Fowler,* 264 Md. 499, 287 A. 2d 280 (1972)), and that there was no evidence of malice. At the end of the whole case the motion was renewed with the comment that counsel had "already stated the grounds," but the grounds for the renewed motion were that he "believe[d] there ha[d] been no proof of malicious prosecution and no proof of malice," with his "particularly point[ing] out that aspect of the case wherein [the] Defendants acted upon advice of counsel." The trial judge said in his instruction to the jury that there was "no direct evidence of any actual malice on the part of the Bank or its officers" and that "[t]here [was] testimony from the witness stand by the bank's officers that they had no actual malice or ill will toward [Mrs. Todd], that the only thing that they had with respect to [her] was an interest in recovering their twelve hundred dollars and seeing that this offense was prosecuted." His instruction on the issue of punitive damages was consistent with that in *Safeway Stores,* 210 Md. 168. The Bank failed to invoke the privilege accorded to it by Rule 554 d to object "to any portion of any instruction given, or to any omission therefrom, or the failure to give any instruction" before the jury retired to

consider its verdict. Our attention has not been called to, nor have we found, a request for an additional instruction which would have embraced the issue here presented. Thus, the point here argued has not been preserved for appellate review.

*Judgment affirmed; appellant to pay the costs.*