## THE FIRST NATIONAL BANK OF ST. MARY'S v. FIDELITY AND DEPOSIT COMPANY

[No. 86A, September Term, 1977.]

*Decided July 18, 1978.*

*Motion for reconsideration filed August 14, 1978; denied August 17, 1978.*

The cause was argued before MURPHY, C. J., and SMITH, LEVINE, ELDRIDGE, ORTH and COLE, JJ., and reargued before MURPHY, C. J., and SMITH, LEVINE, ELDRIDGE, ORTH and COLE, JJ., and SOLOMON LISS, Associate Judge of the Court of Special Appeals, specially assigned.

*Browne L. Kooken,* with whom were *Dukes & Kooken* and *William Aleck Loker,* General Counsel, on the brief, for appellant.

*David A. Levin,* with whom were *Alan R. Siciliano* and *O'Malley, Miles, Farrington & McCarthy* on the brief, for appellee.

SMITH, J., delivered the opinion of the Court. LEVINE, J., dissents and filed a dissenting opinion at page 243 *infra.*

We shall here hold that public policy does not protect appellee, Fidelity & Deposit Company of Maryland (F & D), from liability under its policy of insurance with appellant, The First National Bank of St. Mary's (the Bank), for that portion of a judgment entered against the Bank which included an assessment of exemplary damages.

This case is the direct outgrowth of the unfortunate set of circumstances related in *First National Bank of St. Mary's v. Todd,* 283 Md. 251, 389 A. 2d 371 (1978). That case involved a claim for malicious prosecution in which a Calvert County jury returned a verdict of $4,000 for compensatory damages

against the Bank and one of its employees, and $8,000 punitive damages against the Bank.

The Bank filed a declaratory judgment action against F & D seeking a determination that the latter was "obligated to undertake the complete defense, irrespective of the types of damages claimed, of the action" brought by Mrs. Todd against the Bank and its employee and "[t]hat F & D [was] obligated to pay on behalf of [the Bank and its employee] all sums which they .[might] become obligated to pay as damages, whether they be labeled compensatory or punitive, as a result of the [same] action . . . ." The matter came on for hearing in the Circuit Court for Prince George's County. A stipulation of facts was entered into. The trial judge (Chasanow, J.) rendered a scholarly and well-reasoned opinion holding that F & D must undertake the defense but further holding that it was "not obligated to indemnify the complainant-bank for the ... punitive damages assessed against the Bank." The Bank appealed the latter determination to the Court of Special Appeals. We then granted the Bank's petition for the writ of certiorari prior to argument in that court.

The Bank raises two issues here: (1) that the trial court erred in holding that its liability in the Todd matter was direct rather than vicarious, and (2) that the public policy of this State does not prohibit insurance coverage of exemplary damages in this situation. F & D counters with a contention that the coverage provided in its policy does not extend to punitive damages.

## 1. Policy Coverage

In the Court of Special Appeals F & D would have been entitled to raise the issue of policy coverage in an effort to sustain the judgment of the trial court. It likewise would have been entitled to argue the point in this Court had we granted the writ of certiorari on our own motion. It failed, however, to point out this question either in an answer to the Bank's petition for the writ of certiorari or in a cross-petition for such a writ. Hence, under the reasoning in *Dempsey v. State,* 277

Md. 134, 355 A. 2d 455 (1976), and *Walston v. Sun Cab. Co.,* 267 Md. 559, 298 A. 2d 391 (1973), the matter is not before us.[1] In this instance we have examined the policy provision in question and conclude that if the matter were properly before us we would hold that the trial judge did not err in determining that its provisions embraced an award for exemplary damages.

## 2. Vicarious v. Direct Liability

The Bank has overlooked the written stipulation of facts the parties entered into in this case, paragraphs six and seven of which read as follows:

> "6. Counsel for Alma Todd wrote a letter to the First National Bank of St. Mary's County outlining the defenses of Alma Todd and requesting that the matter be handled civilly rather than through criminal prosecution. After advice of counsel, *it was the corporate decision* of the First National Bank of St. Mary's County to continue with the criminal prosecution.
>
> "7. After consultation with counsel, the First National Bank of St. Mary's County, *as a matter of corporate policy,* rejected the offers of Alma Todd and *made the corporate decision in the furtherance of the business purposes of the corporation* to prosecute Alma Todd."[2] (Emphasis added.)

Thus, the trial judge did not err in holding that liability was direct rather than vicarious.

1. We recognize that certiorari procedure in Maryland is comparatively new and counsel may not have fully understood the scope of review under such procedure. Therefore, to avoid further misunderstanding, on May 5, we adopted Maryland Rule 813 effective July 1, 1978, spelling out in detail the scope of review on certiorari.

2. There was no contention on appeal in First National Bank of St. Mary's v. Todd, 283 Md. 251, 389 A. 2d 371 (1978), that the Bank had acted upon the advice of counsel. Under our holding in Gladding Chevrolet v. Fowler, 264 Md. 499, 287 A. 2d 280 (1972), if the Bank had shown that it acted upon the advice of counsel in swearing out the warrant after full disclosure to the attorney, this would have been a defense against a malicious prosecution action.

### 3. Public Policy

As we have already related, Mrs. Todd's action against the Bank and its employee was for malicious prosecution. In *Safeway Stores, Inc. v. Barrack,* 210 Md. 168, 177, 122 A. 2d 457 (1956), this Court held that punitive damages could be recovered in such an action if a jury found "a want of probable cause, plus malice, but that malice might be inferred from a want of probable cause." To the same effect *see Montgomery Ward & Co. v. Keulemans,* 275 Md. 441, 448, 340 A. 2d 705 (1975).

In *Wedeman v. City Chevrolet Co.,* 278 Md. 524, 531, 366 A. 2d 7 (1976), Judge Lévine pointed out for the Court that exemplary "damages are awarded, over and above full compensation, to punish the wrongdoer, to teach him not to repeat his wrongful conduct and to deter others from engaging in the same conduct." It is from such statements by this and other courts relative to the purpose of such damages that the public policy argument is constructed, it being contended that if the wrongdoer may have someone else bear the expense of paying such an assessment that the deterrent effect is lost.

In *Maryland-National Capital Park and Planning Commission v. Washington National Arena,* 282 Md. 588, 386 A. 2d 1216 (1978), Judge Levine fully reviewed the public policy doctrine for this Court. *See also Food Fair Stores, Inc. v. Joy,* 283 Md. 205, 389 A. 2d 874 (1978). However, the issue here presented does not appear to have previously been considered by this Court.

There are divergent points of view as to whether it is against public policy to provide insurance coverage for exemplary damages. A large number of the cases involve claims arising from automobile accidents.[3] The cases are collected and analyzed in Annot., 20 A.L.R.3d 343 (1968), and the 1977 supplement thereto. Holdings against such coverage include: *American Surety Com-*

---

3. Only under the peculiar facts and circumstances existing in Smith v. Gray Concrete Pipe Co., 267 Md. 149, 297 A. 2d 721 (1972), has this Court permitted recovery of exemplary damages in-connection with an automobile accident.

*pany of New York v. Gold,* 375 F. 2d 523 (10th Cir. 1966) (applying Kansas law); *Northwestern National Casualty Company v. McNulty,* 307 F. 2d 432 (5th Cir. 1962) (applying Virginia and Florida law); *Ging v. American Liberty Insurance Company,* 293 F. Supp. 756 (N.D. Fla. 1968) (applying Florida law); *Commercial Union Insurance Co. of New York v. Reichard,* 262 F. Supp. 275 (S.D. Fla. 1966) (applying Florida law); *American Insurance Co. v. Saulnier,* 242 F. Supp. 257 (D. Conn. 1965) (applying Connecticut law); *Tedesco v. Maryland Casualty Co.,* 127 Conn. 533, 18 A. 2d 357 (1941); *Crull v. Gleb,* 382 S.W.2d 17 (Mo. App. 1964); *Newark v. Hartford Accident & Indemnity Co.,* 134 N.J. Super. 537, 342 A. 2d 513 (App. Div. 1975); *LoRocco v. N.J. Mfrs. Ind. Ins. Co.,* 82 N.J. Super. 323, 197 A. 2d 591 (App. Div. 1964); and *Esmond v. Liscio,* 209 Pa. Super. 200, 224 A. 2d 793 (1966).

Cases holding insurance coverage for such damages not outlawed by public policy include: *Hartford Life Insurance Co. v. Title Guarantee Co.,* 520 F. 2d 1170 (D. C. Cir. 1975); *Price v. Hartford Accident and Indemnity Company,* 108 Ariz. 485, 502 P. 2d 522 (1972); *Southern Farm Bur. Cas. Ins. Co. v. Daniel,* 246 Ark. 849, 852, 440 S.W.2d 582 (1969); *Greenwood Cemetery v. Traveler's &c. Co.,* 238 Ga. 313, 232 S.E.2d 910 (1977); *Abbie Uriguen Olds. Buick, Inc. v. United States F. I. Co.,* 95 Idaho 501, 511 P. 2d 783 (1973); *Continental Insurance Companies v. Hancock,* 507 S.W.2d 146 (Ky. 1974); *Colson v. Lloyd's of London,* 435 S.W.2d 42 (Mo. App. 1968); *Harrell v. Travelers Indemnity Co.,* 279 Ore. 199, 567 P. 2d 1013 (1977); and *Lazenby v. Univ. U'wtrs. Ins. Co.,* 214 Tenn. 639, 383 S.W.2d 1 (1964).

The leading case denying coverage is that of *Northwestern National Casualty Company v. McNulty,* 307 F. 2d 432. That opinion has been quoted numerous times by courts considering this issue. Severe injuries were involved, including permanent damage to the brain, sustained in an accident in which a drunken driver traveled at an excessive rate of speed. Judge Wisdom said for the court:

> "Where a person is able to insure himself against punishment he gains a freedom of misconduct

inconsistent with the establishment of sanctions against such misconduct. It is not disputed that insurance against criminal fines or penalties would be void as violative of public policy. The same public policy should invalidate any contract of insurance against the civil punishment that punitive damages represent.

"The policy considerations in a state where, as in Florida and Virginia, punitive damages are awarded for punishment and deterrence, would seem to require that the damages rest ultimately as well [as] nominally on the party actually responsible for the wrong. If that person were permitted to shift the burden to an insurance company, punitive damages would serve no useful purpose. Such damages do not compensate the plaintiff for his injury, since compensatory damages already have made the plaintiff whole. And there is no point in punishing the insurance company; it has done no wrong. In actual fact, of course, and considering the extent to which the public is insured, the burden would ultimately come to rest not on the insurance companies but on the public, since the added liability to the insurance companies would be passed along to the premium payers. Society would then be punishing itself for the wrong committed by the insured." *Id.* at 440-41.

The premier case holding insurance coverage for exemplary damages not barred by public policy is *Lazenby v. Univ. U'wtrs. Ins. Co.,* 214 Tenn. 639. It also involved a drunken driver. *McNulty* was relied upon by the insurance company in *Lazenby.* In holding recovery not barred by public policy, the court said:

"We accept, as common knowledge, the fact death and injuries on our highways and streets is a very serious problem and such is a matter of great public concern. We further accept, as common knowledge, socially irresponsible drivers, who by their actions in operation of motor vehicles, could be liable for

punitive damages are a great part of this problem. We, however, are not able to agree the closing of the insurance market, on the payment of punitive damages, to such drivers would necessarily accomplish the result of deterring them in their wrongful conduct. This State, in regard to the proper operation of motor vehicles, has a great many detailed criminal sanctions, which apparently have not deterred this slaughter on our highways and streets. Then to say the closing of the insurance market, in the payment of punitive damages, would act to deter guilty drivers would in our opinion contain some element of speculation." *Id.* at 647.

The majority and dissenting opinions in *Harrell v. Travelers Indemnity Co.,* 279 Ore. 199, present well stated analyses of the issues here before the Court. *Harrell* was yet another case involving reckless driving after drinking. The court pointed out:

"[T]his case does not involve the application of any settled and established rule of contract 'public policy,' but the adoption in Oregon of a proposed new rule of 'public policy' under which both existing and future insurance contracts which undertake to provide protection from liability for punitive damages would be held to be invalid.

"It has been said of 'public policy' as a ground for invalidation by the courts of private contracts that 'those two alliterative words are often used as if they had a magic quality and were self-explanatory * * *'[3] and that for a court to undertake to invalidate private contracts upon the ground of 'public policy' is to mount 'a very unruly horse, and when you once get astride it you never know where it will carry you.'[4]"

"3. 6A Corbin on Contracts 10, § 1375 (1962).

"4. 14 **Williston on Contracts 7-8, § 1629 (3d ed. 1972).**" *Id.* at 205-06, 567 P.2d at 1016.

The same observations could be made relative to this case. The majority opinion noted in *Harrell*:

"It necessarily follows that if the rule proposed by defendant were adopted, the conduct subject to possible liability for punitive damages, and which could no longer be the subject of protection by a valid contract of insurance, would include a wide spectrum of conduct that would impose liability not only upon automobile drivers, but also upon business and professional persons, firms and corporations, as well as upon ordinary persons when engaged in a wide variety of activities. As examples:

\* \* \*

"(3) The owner of a retail store who causes the arrest and prosecution of a suspected shoplifter under circumstances not sufficient to constitute 'probable cause' may also have an uninsurable liability for punitive damages because the jury may make a finding of malice based upon lack of probable cause.

\* \* \*

"Under the rule proposed by the defendant, and as held by the trial court, even though the risks involved in each of these examples were of such a nature as to be encountered in the operation of such business or professions, and the conduct involved did not involve 'intentionally inflicted injury,' any contract with an insurance company to provide protection against the risk of punitive damages as the result of such conduct would become invalid as a matter of 'public policy,' regardless of whether the insurance contract was negotiated upon payment of an additional premium for protection against such liability." *Id.* at 209-11, 567 P. 2d at 1018-19 (footnote omitted).

The court further stated:

"In our view, it is naive at least, if not pure fiction, to·hold that an insurance contract against liability for punitive damages is invalid as contrary to public policy because such a contract would 'shift the burden' to an insurance company so as to either 'punish' it or have it pass that burden 'on [to] the public,' so as to 'punish society.'

"On the contrary, an insurance company which deliberately enters into a contract to provide coverage against liability for punitive damages is free to charge either a separate or additional premium for that risk. Conversely, if an insurance contract excludes coverage for liability against punitive damages no such additional premium need be charged and the insurance company may charge a lower premium for such a policy." *Id.* at 213, 567 P. 2d at 1019.

The Oregon court pointed out that there might be other alternatives which would be preferable to the then state of the law in Oregon on the subject of such damages, such as elimination of punitive damages, some limitation upon the amount of award or awards for such damages, or a limitation of liability "to flagrant misconduct, such as intentionally inflicted injury." It observed, however, that those "possible alternatives might more appropriately be considered by the legislature, rather than by the courts." The same comments could be made relative to Maryland.

The dissent in *Harrell* may be well summed up in the statement:

"The purpose of compensatory damages is to compensate, and this purpose is carried out no matter who is held ultimately responsible for payment. The purpose of punitive damages, on the other hand, is to deter, and this purpose is not carried out if the one who ultimately pays is an insurer rather than the wrongdoer." *Id.* at 229-30, 567 P. 2d at 1028.

The arguments of F & D and those presented in cases such as *McNulty* and the *Harrell* dissent have a theoretical, intellectual appeal. That appeal fades materially, however, when we survey the problem in practical terms, looking at certain bench marks for guidance. First and foremost among those bench marks is the comment of our predecessors on the issue of public policy, an admittedly difficult term to define. In *Estate of Woods, Weeks & Co.,* 52 Md. 520 (1879), Judge Miller said for the Court: [4]

> "[T]he right of parties to contract as they please is restricted only by a few well defined and well settled rules, and it must be a very plain case to justify a court in holding a contract to be against public policy. It must be a case in which the common sense of the entire community would so pronounce it." *Id.* at 536.

Chief Judge McSherry quoted this language for the Court in *Heller v. Marine Bank,* 89 Md. 602, 618, 43 A. 800 (1899).

In discussing agreements contrary to public policy, W. Brantly, *Law of Contract* (2d ed. 1922) states:

> "Another element of uncertainty in the application of this principle is that the popular, and consequently the judicial view of what is right and wrong, fair and unfair, changes and varies in a silent and unconscious growth. What one generation deems fair and right is in the *mores* of age, and another generation may deem it wrong, and that makes it wrong." *Id.* at 220-21 (footnote omitted).

---

4. In his The Court of Appeals of Maryland, A History (1928), Chief Judge Carroll T. Bond observes relative to Judge Miller:

"[S]ome of the most discerning lawyers regarded him as the soundest judge on the court. And later study of his opinions as authorities has made this estimate wide spread. As Judge Robert N. Martin said of Chief Justice Taney, there was no glare about his intellect but it was perfectly luminous." *Id.* at 182 (footnote omitted).

A somewhat similar statement was made for the Supreme Court by Mr. Justice Sutherland in *Patton v. United States,* 281 U. S. 276, 50 S. Ct. 253, 74 L. Ed. 854 (1930):

> "The truth is that the theory of public policy embodies a doctrine of vague and variable quality, and, unless deducible in the given circumstances from constitutional or statutory provisions, should be accepted as the basis of a judicial determination, if at all, only with the utmost circumspection. The public policy of one generation may not, under changed conditions, be the public policy of another."
> *Id.* at 306.

To like effect *see Funk v. United States,* 290 U. S. 371, 381, 54 S. Ct. 212, 78 L.Ed.2d 369 (1933).

It is pointed out in 5 S. Williston, *Law of Contracts* § 1629A at 4558 n. 4 (rev. ed. S. Williston & G. Thompson 1937) that the legislature is the normal policy-declaring department of the government, citing F. Pollock, *Contracts* 350 (10th ed.). In this regard we observe that Maryland Code (1957, 1964 Repl. Vol., 1977 Cum. Supp.) Art. 101, § 47 states concerning workmen's compensation awards to minor employees:

> "All compensation and death benefits provided by this article, however, may be doubled in the discretion of the Commission in the case of any minor employed illegally under the laws of this State, and no insurance policy shall be available to protect the employer of such minor from the payment of the extra or additional compensation or benefits to be awarded by reason of such illegal employment, but the employer alone shall be liable for the said increased amount of compensation or death benefits . . . ."

It thus will be seen that when the General Assembly has desired to forbid protection by insurance from the equivalent of exemplary damages, it has done so explicitly.

Many years ago the Supreme Court said in *Waters v. The Merchants' Louisville Insurance Company,* 36 U. S. (11

Peters) 213, 221, 9 L. Ed. 691 (1837), "There is nothing unreasonable, unjust, or inconsistent with public policy, in allowing the insured to insure himself against all losses from any perils not occasioned by his own personal fraud."

According to 17 Am. Jur.2d *Contracts* § 180 (1964), contracts which "have been held to be void as against public policy" include "agreements having a tendency to obstruct or interfere with the administration of justice, or to injure public service; contracts clearly repugnant to sound morality, such as contracts based on illicit association or intercourse; agreements to commit a crime or to reward one for the commission of a crime or for the suppression or compounding of a crime; agreements to wrong or defraud third persons; and contract provisions for immunity from bad faith or fraud," among others. Contracts which aid the enemy or operate to the disadvantage of the country in time of war are noted as against public policy in 17 C.J.S. *Contracts* § 270 (1963). In § 271 at 1182-83 that work lists some contracts held void as against public policy, such as those for rewards for the arrest of persons where the arrest would be illegal; a sham agreement intended to enable one party to reduce his tax liability; contracts involving the unlawful practice of law; and contracts not within the powers conferred on banks and which jeopardize the safety of bank deposits. We have no doubt that the common sense of the entire community, to which Judge Miller referred in *Estate of Woods,* would in each instance pronounce those contracts void as against public policy.

Of course, the Bank could have avoided liability here by having made a full disclosure to counsel of all of the facts and circumstances and then not proceeding to swear out the warrant in question without his approval since, as we held in *Gladding Chevrolet v. Fowler,* 264 Md. 499, 287 A. 2d 280 (1972), if one acts upon the advice of counsel in swearing out such a warrant after full disclosure to the attorney, this is a defense against a malicious prosecution action. If counsel were consulted prior to institution of the malicious prosecution as the stipulation of facts would indicate, it was not established that there was sufficient consultation and

disclosure to avoid liability. Those who have had experience as counsel to small businesses know that many of them neglect to consult counsel until after legal complications have arisen as a result of some act of the business or on its behalf.

If we were to hold that F & D was barred by public policy from paying the exemplary damages assessed against the Bank and thus that it had to be paid by the stockholders of the Bank, such a holding would have implications far beyond this case, as was pointed out forcefully in *Harrell.* It would be equally applicable to the small businessman who has attempted to protect his business by purchasing various types of liability insurance. If we were to determine that it is against public policy for one to protect himself by insurance against exemplary damages, such a small businessman could be crippled or virtually wiped out by an assessment of exemplary damages in a malicious prosecution action where he proceeded with what he regarded as good reason to prosecute a shoplifter but the courts found that he lacked probable cause for such pursuit. The same would be true of the small businessman who is angered at being given a bad check for a past due account and then proceeds to swear out a warrant for the arrest of that individual, not being cognizant of the fact that to constitute a violation of our statute there must be a present consideration. *See State v. Sinclair & Sinwellan Corp.,* 274 Md. 646, 337 A. 2d 703 (1975). It is not an adequate answer to such concerns to say that the trier of fact assessing such damages has before it the net worth of the offending party, because insofar as many small business people are concerned that net worth will to a large degree be composed of their home and the stock in trade or other assets of their business. We suspect that in such situations the common sense of the entire community would not construe such insurance contracts to be against public policy. In fact, we strongly suspect that the common sense of the community as a whole would expect a judgment including exemplary damages to be satisfied through the insurance policies for which such small business people had paid. It would be outraged and have substantial difficulty in comprehending reasons for a holding to the contrary.

It cannot properly be said that permitting payment of exemplary damages by an insurance company eliminates deterrence, notwithstanding the fact that the loss is thus spread across a number of policyholders through the payment of premiums. This is so because those who are demonstrated by experience to be poor risks encounter substantial difficulty in obtaining insurance, a fact such persons know. If they had no such difficulty it would not have been necessary to create the Maryland Automobile Insurance Fund to provide insurance coverage for poor risks insofar as automobile liability insurance is concerned. *See* Code (1957, 1972 Repl. Vol., 1977 Cum. Supp.) Art. 48A, §§ 243-243M. We have seen flight from the State of Maryland of the companies who have previously carried malpractice insurance for the medical and legal professions. They gave as their reason for such flight the lack of profitability to them of this insurance, a reason that must be directly connected with claims made and paid. In the case of physicians not only was a different procedure for handling malpractice claims established, but provision was made by statute for the Medical Mutual Liability Insurance Society of Maryland, which the doctors then proceeded to establish. *See* Code (1974, 1977 Cum. Supp.) §§ 3-2A06 to -2A09, Courts and Judicial Proceedings Article; *Attorney General v. Johnson,* 282 Md. 274, 385 A. 2d 57 (1978); and Code (1957, 1972 Repl. Vol., 1977 Cum. Supp.) Art. 48A, §§ 548-556. In the case of lawyers it has been necessary to drastically change the type of insurance coverage. *See* the reports of the Maryland State Bar Association's Special Committee to Study the State Bar Insurance Programs, 83 Trans. Md. St. B. A. 44 (Jan. 1978) and 82 Trans. Md. St. B. A. 133-136 (1977). Those with substantial exposure in certain instances may have policies written with retrospective premiums where the premium is computed after losses are determined. For example, many operators of truck fleets have just such provisions in their public liability and property damage insurance policies.

Insurance companies have not shown a reluctance in the past to write into their policies such restrictions as they deem to be in their best interest, yet no restriction relative to the

issue at bar appears in the policy issued by F & D. Surely since the decision in *Lazenby* 14 years ago, if not before, these companies have been cognizant of the fact that they might be called upon to pay an award such as that at issue in this case. As a consequence, they probably have considered such a possibility in establishing rates.

The General Assembly has not seen fit to make a pronouncement on the subject with which we are here concerned except for the single provision relative to claims in workmen's compensation cases, a provision inserted in the law when double benefits for illegal employment were added to that act by Chapter 536 of the Acts of 1927.

We bear in mind the admonition of Mr. Justice Sutherland in *Patton* that because "the theory of public policy embodies a doctrine of vague and variable quality," that if it is not "deducible in the given circumstances from constitutional or statutory provisions, [it] should be accepted as the basis of a judicial determination, if at all, only with the utmost circumspection." There is in this instance not the slightest suggestion of a "constitutional or statutory provision" from which a public policy against payment is deducible. Therefore, applying "the utmost circumspection," we find that "the common sense of the entire community would [not] pronounce it" against public policy for the Bank's insurance company to pay the judgment for exemplary damages assessed against the Bank here.

*Judgment reversed; costs to be paid by the appellee.*

## Levine, J., dissenting:

Swayed by what it terms "practical" considerations, the majority today holds that the public policy of this state does not bar enforcement of insurance contracts which permit defendants to obtain reimbursement for sums awarded as punitive damages in actions to redress intentional and quasi-intentional torts. In so doing, the Court has *sub silentio* dealt a death blow to the theory of exemplary damages

applied in Maryland for well over a century.[1] Because I believe such a radical transformation of the law of punitive damages to be both unsound and unwise, I respectfully dissent.

Whenever a contractual provision is asserted to be void as against public policy, it is the responsibility of the court to balance carefully the public and private interests in having the disputed promise implemented against those policies which would be advanced were the term held invalid. As we stated just this term in *Maryland-National Capital Park and Planning Commission v. Washington National Arena,* 282 Md. 588, 607, 386 A. 2d 1216 (1978):

> "Enforcement will be denied only where the factors that argue against implementing the particular provision clearly and unequivocally outweigh the law's traditional interest in protecting the expectations of the parties, its abhorrence of any unjust enrichment, and any public interest in the enforcement of the term."

Among those factors militating against enforcement of a particular contract provision for reasons of public policy are: 1) the strength of the public policy as manifested by either legislation or judicial decisions; and 2) the likelihood that a refusal to enforce the disputed term will further the policy. *Maryland-National Capital Park and Planning Commission v. Washington National Arena,* 282 Md. at 607 n.8.[2]

---

1. Although punitive damages have been recognized by the common law since the mid-eighteenth century, Huckle v. Money, 2 Wils. 205, 207 (K.B. 1763), the first Maryland decision expressly recognizing the doctrine was handed down in 1857. Gaither v. Blowers, 11 Md. 536, 552-53 (1857).

2. Adopting in major part the recent proposal of the American Law Institute, Restatement (Second) of Contracts § 320 (Tent. Draft No. 12, 1977), this Court in Maryland-National Capital Park and Planning Commission v. Washington National Arena, 282 Md. 588, 386 A. 2d 1216 (1978), endeavored to reduce the vagaries of the common law approach to illegality by applying a more structured analytical framework to the resolution of public folicy challenges. In the present appeal, the majorits has, for some reason, completely ignored the principles laid down in the *Arena* decision, resurrecting instead an ill-defined century-old standard articulated in Estate of Woods, Weeks & Co., 52 Md. 520, 536 (1879) (an agreement violates public policy only when "the common sense of the entire community would ... pronounce it" invalid). Why

The policies weighing against implementation of the insurance contract provision in the case at hand are those **which underlie the doctrine of punitive damages, namely** deterrence and punishment. In my opinion, these policies can only be promoted by *denying* enforcement of those insurance agreements which indemnify adjudicated intentional tortfeasors against liability for exemplary damages. A contrary result, such as that reached by the majority today, would in practical effect be tantamount to abolishing punitive damages altogether. Under these circumstances the countervailing dictates of public policy "clearly and unequivocally outweigh" the public and private interests in protecting the expectations of the contracting parties.

Punitive damages, as distinguished from compensatory or nominal damages, are sums awarded for reasons of public policy against a person to punish him for his outrageous behavior. *Superior Construction Co. v. Elmo,* 204 Md. 1, 14, 102 A. 2d 739, 104 A. 2d 581, 48 A.L.R.2d 932 (1954). Recently, this Court reiterated what has long been recognized as the two-fold purpose of awarding punitive damages in civil actions:

> "The prinicpal historical justification for awards of punitive or exemplary damages in pure tort cases is that they operate *to punish reprehensible and outrageous conduct and to set an example which will serve to deter* the wrongdoer and others from engaging in such conduct in the future." *General Motors Corp. v. Piskor (II),* 281 Md. 627, 638, 381 A. 2d 16 (1977) (emphasis added).

*Accord, Wedeman v. City Chevrolet Co.,* 278 Md. 524, 531, 366 A. 2d 7 (1976); *see generally* D. Dobbs, *Handbook on the Law of Remedies* § 3.9, at 205 (1973).[3]

---

the majority deems it necessary to abandon controlling authority barely two months old in favor of such outmoded and patently inadequate precedent defies explanation and, furthermore, contravenes the principle of *stare decisis.*

3. Aside from punishment and deterrence, exemplary damages may also serve to channel a plaintiff's anger from retaliating against a defendant when the tortious act injures his dignity more than his pocketbook, or they may simply reflect social outrage apart from any remedial purpose. Harrell

If we assume, as our prior case law says we must, that the goals of punishing and deterring extreme and outrageous behavior are subserved by allowing punitive damages in appropriate cases, it follows inexorably that the burden of the penalty so assessed must be borne exclusively by the culpable party. The risk of such a loss thus cannot, consistent with the theory behind exemplary damage awards, be shifted to a third party, be it a surety, an insurance company or the public at large. *See Butler v. United Pacific Ins. Co.,* 265 Or. 473, 509 P. 2d 1184, 1186 (1973) (holding on policy grounds that surety was not liable for punitive damages assessed against obligor). Were it otherwise, the admonitory function of punitive damages, *see* Morris, *Punitive Damages in Tort Cases,* 44 Harv. L. Rev. 1173, 1205 (1931), would be totally neutralized. Logic therefore demands that individuals or **enterprises directly responsible for the commission of** outrageous injurious acts be prohibited from escaping the impact of an award of exemplary damages through the simple expedient of purchasing liability insurance.

> "[T]he public policy against coverage is . . . to make effective the discouragement of wrong-doing by the imposition of punishment. Where a person is able to insure himself against punishment he gains a freedom of misconduct inconsistent with the establishment of sanctions against such misconduct. It is not disputed that insurance against criminal fines or penalties would be void as violative of public policy. The same public policy should invalidate any contract of insurance against civil punishment that punitive damages represent." *Northwestern National Casualty Co. v. McNulty,* 307 F. 2d 432, 440 (5th Cir. 1962) (per Wisdom, J.).

*Accord, American Surety Company of New York v. Gold,* 375 F. 2d 523, 526 (10th Cir. 1966); *Norfolk & W. Ry. Co. v. Hartford Acc. & Indem. Co.,* 420 F. Supp. 92, 95 (N.D. Ind.

---

v. Travelers Indemnity Co., 279 Or. 199, 567 P. 2d 1013, 1029 (1977) (Linde, J., dissenting). *See* Morris, *Punitive Damages in Tort Law,* 44 Harv. L. Rev. 1173, 1198 (1931).

1976); *American Insurance Co. v. Saulnier,* 242 F. Supp. 257 (D. Conn. 1965); *Crull v. Gleb,* 382 S.W.2d 17, 23 (Mo. App. 1964); *Esmond v. Liscio,* 209 Pa. Super. 200, 224 A. 2d 793, 799 (1966) (allocatur denied).

Reduced to its essentials, the majority's argument in favor of permitting insurance for punitive damage liability is founded on a noble but rather misplaced solicitude for the economic well-being of small businessmen.[4] Focusing its attention on the tort of malicious prosecution, the majority. warns that a local proprietor could be "virtually wiped out by an assessment of exemplary damages," even though he might have in good faith sworn out a criminal complaint against a suspected shoplifter, only to be confronted after trial with a jury finding that he lacked probable cause for the accusation. **283 Md. at 241.**

In response to this contention, I must first point out that under the prevailing view punitive damages may only be awarded when the tortious conduct can be described as extreme or outrageous, similar to that usually found in crime. Restatement (Second) of Torts § 908, Comment b (Tent. Draft No. 19, 1973). Whenever a person comports himself in an outrageous manner and thereby causes injury to another, he exposes himself to the risk of liability for damages in excess of those necessary to compensate his victim. This holds true even for small businessmen whose conduct crosses the line into the realm of the reprehensible; they are entitled to no more or less protection than others who commit acts of a kind meriting the imposition of exemplary damages. Even though financial disaster may be the immediate consequence of a punitive damage award, there is no injustice in the eyes of the law, provided the punishment exacted reasonably corresponds to the gravity of the tortious conduct involved.

What troubles the majority is the fact that in malicious prosecution actions (and in those cases alone), it is possible under existing Maryland law for a plaintiff to recover

4. The majority's preoccupation with the plight of the small business community is somewhat surprising considering the fact that the tortfeasor in this case is one of southern Maryland's leading banking institutions and thus hardly qualifies as a small business.

punitive damages even though the defendant's conduct, objectively viewed, is not truly extreme or outrageous. Our cases hold that punitive damages may always be awarded whenever the defendant is adjudged guilty of malicious prosecution, *e.g., Safeway Stores, Inc. v. Barrack,* 210 Md. 168, 176, 122 A. 2d 457 (1956), on the theory that the malice necessary to support an exemplary damage award is an element of the tort itself. *See Siegman v. Equitable Trust Co.,* 267 Md. 309, 317, 297 A. 2d 758 (1972). While it is certainly true that malice must be shown in order to support an action for malicious prosecution, *Cecil v. Clarke,* 17 Md. 508, 524 (1861), such malice need not be separately proved, but may be inferred from a want of probable cause on the part of the defendant. *Exxon Corp. v. Kelly,* 281 Md. 689, 699-701, 381 A. 2d 1146 (1978). And where malice is inferred from a lack of probable cause, punitive damages may be recovered. *Montgomery Ward & Co. v. Keulemans,* 275 Md. 441, 448, 340 A. 2d 705 (1975). Clearly, a finding that a defendant instituted criminal proceedings against a plaintiff based on something less than probable cause does not necessarily mean that the defendant's conduct in this regard was either extreme or outrageous.

As we have noted, the rule which permits recovery of exemplary damages without a showing of extreme reprehensible behavior is unique to the tort of malicious prosecution. Indeed, it would be accurate to describe it as an anomaly in the law of damages. Nevertheless, the majority would build upon this aberration to justify a broad-sweeping rule allowing persons to insure themselves against punitive damage awards in *all* tort cases where such damages are otherwise available. I find such a result utterly untenable.

If punitive damages are presently collectible in malicious prosecution cases for conduct that is substantially less than outrageous, the answer would be either to modify the present law by requiring a higher degree of offensiveness as a precondition to punitive damage recovery in such cases or to permit parties to insure against exemplary damages only in malicious prosecution actions, and then only where tort liability is predicated upon implied malice. Of these two

alternatives, the former is to be preferred, since such an approach would insure that punitive damages would be assessed in all tort actions according to a uniform standard of culpability. Furthermore, limiting the recovery of exemplary damages to cases involving extreme or outrageous behavior would be most in keeping with the twin functions of punitive damage awards: punishment and deterrence.

The majority opinion also suggests that the deterrent effect of punitive damages will be preserved even though tortfeasors, under its holding, may now be indemnified for adverse punitive damage judgments. "This is so," says the majority, "because those who are demonstrated by experience to be poor risks encounter substantial difficulty in obtaining insurance." 283 Md. at 242. It is probably true that poor risks will be required to pay higher premiums to acquire the desired coverage and that this ostensibly will have a slight deterrent effect. But the impact of a hike in insurance premiums payable over the course of several months and probably deductible for income tax purposes, plainly will be far less than that caused by a lump sum judgment for which the defendant is solely responsible. It is precisely the threat of sudden and severe economic loss which lends credibility to the *deterrence* theory of punitive damages.[5]

Finally, the majority makes much of the fact that the General Assembly has never acted to prohibit insurers from providing liability coverage against punitive damage awards. It would appear to be the majority's position that in order for a court to strike down punitive damage insurance as void against public policy, the Legislature must have first voiced its objection to such coverage expressly or by clear implication.

---

5. The deterrent function of punitive damage awards should not be overestimated. One who acts out of anger or hate in committing an assault, for example, is not apt to be deterred by a fear of exemplary damages. Wedeman v. City Chevrolet Co., 278 Md. 524, 532, 366 A. 2d 7 (1976). On the other hand, where, as here, a tortfeasor engages in intentional misconduct pursuant to a well-defined corporate policy, such a defendant is more likely to pause and consider the consequences if made aware that it may be liable to pay more than the actual loss sustained by potential victims. *See id.*

To my knowledge, no such limitation on the public policy doctrine has ever been adopted by this Court. Rather, our cases teach that in seeking to define the scope of a particular public policy, courts may refer to various diverse sources, including, in particular, judicial opinions. *Maryland-National Capital Park and Planning Commission v. Washington National Arena, supra,* 282 Md. at 605-06. Public policy is not derived exclusively from constitutional provisions and legislative enactments. Reference to judicial opinions is especially appropriate, even necessary, where the controversy centers around the proper application of a doctrine like punitive damages, which is first and foremost a common law rule based on policies identified and explicated by the judiciary.

The decisions of this Court have consistently and wholeheartedly affirmed and reaffirmed the doctrine of punitive damages and the policies of deterrence and punishment upon which it is founded. That the Legislature has not sought to intervene in this area of the common law indicates to me its willingness to allow the courts to continue to control the evolution of the law of punitive damages. Thus, whether or not to allow private persons to insure themselves against punitive damages, involving, as it does, the proper application of judicially defined policies, is a question squarely within the competence of the courts to resolve.

For these reasons, I would hold that the expectation interests of the parties to the insurance contract in dispute here are clearly and unequivocally outweighed by the important public policies underlying the law of punitive damages in tort cases. The trial judge, in my opinion, acted correctly in denying appellant's claim for indemnification on the grounds that the agreement, to the extent that it insured against liability for punitive damages, offended the public policy of this state.