No. 83-299

IN THE SUPREME COURT OF THE STATE OF MONTANA

1984

FIRST BANK (N.A.)-BILLINGS,

        Plaintiff,

   -vs-

TRANSAMERICA INSURANCE CO.,
a foreign corp.,

        Defendant.

ORIGINAL PROCEEDING:

COUNSEL OF RECORD:

    For Plaintiff:

        Moulton, Bellingham, Longo & Mather; Ward Swanser
        and Greg Murphy argued for First Bank, Billings,
        Montana

    For Defendant:

        Crowley, Haughey, Hanson, Toole & Dietrich; Bruce
        R. Toole and Carolyn Ostby argued for Transamerica
        Ins. Co., Billings, Montana

                Submitted: November 29, 1983

                    Decided: April 3, 1984

Filed:

APR 3 1984

_____
               Clerk

Mr. Justice L.C. Gulbrandson delivered the Opinion of the Court.

The United States District Court for the District of Montana has certified two questions to this Court for instructions concerning Montana law.

First Bank Billings has been named a defendant in three wrongful repossession cases, two of which have been filed in the District Court of the Thirteenth Judicial District, Yellowstone County, and one in the United States District Court for the District of Montana. Transamerica has undertaken the defense of First Bank, but has reserved its rights under its insurance contract with the bank and has denied any coverage for punitive damages under this contract. Transamerica argues that the public policy of Montana forbids such coverage. On motion of First Bank, the United States District Court has certified the following questions to this Court:

(1) Does the public policy of Montana permit insurance coverage of punitive damages?

(2) If the public policy of Montana does not generally permit insurance coverage of punitive damages, would it nevertheless permit coverage for punitive damages for which a banking corporation is or could be held liable by reasons of the acts of its employees?

For the reasons stated below, we conclude in response to the first question that insurance coverage of punitive damages is not a violation of public policy. Thus, we need not address the substance of the second question.

Counsel for First Bank have presented ten considerations in support of permitting insurance coverage

of punitive damages. Transamerica has mounted a strong challenge to all of these considerations. We recognize that there is considerable authority supporting the positions of both parties. See generally Annot., 16 ALR 4th 11 (1982) (comparing and contrasting different views on liability insurance coverage as extending to liability for punitive or exemplary damages). We note, however, that most of the important decisions, as well as the major arguments of the parties, emphasize three primary considerations as ultimately dispositive of the questions before us. These are (1) public policy as expressed in constitutions and statutes; (2) the purpose of punitive damages; and (3) the circumstances under which punitive damages become available to aggrieved plaintiffs. Although we address these matters separately in this opinion, we recognize that they are interrelated to a high degree, and we therefore are careful not to sever the important ties that bind them together.

Before proceeding to the critical issues, we must first address a disagreement between the parties concerning the focus of our review. First Bank has urged this Court to center on what it claims are the "blanket terms" of the insurance contract, wherein Transamerica agrees to "pay on behalf of the insured all sums which the insured shall be legally obligated to pay as damages because of personal injury or advertising injury to which this insurance applies . . . " First Bank inferentially asks this Court to answer the certified question in light of this contract language. Specifically, we are asked to decide whether public policy bars coverage even when the contract supposedly provides indemnification for "all sums" arising from liability.

We reject the approach suggested by First Bank. Transamerica correctly notes that the certified questions forwarded by the Federal District Court do not call for an interpretation of contract language. We are asked only to decide whether public policy permits or bars coverage of punitive damages, regardless of the contract language. We leave the threshold issue of contract interpretation for the Federal District Court to decide. For similar reasons, we also decline to review allegations by First Bank that Transamerica is attempting to "wriggle out" of its negotiated insurance contract. That, too, is a matter for decision by the District Court.

## SOURCES OF PUBLIC POLICY IN MONTANA

"Public policy is that principle of law which holds that no citizen can lawfully do that which has a tendency to be injurious to the public or against public good." Spaulding v. Maillet (1920), 57 Mont. 318, 323, 188 P. 377, 378-9. Public policy is typically found "in the constitution and the laws and the course of administration." St. Louis Mining & Milling Co. v. Montana Mining Co. (1898), 171 U.S. 650, 655, 19 S.Ct. 61, 63, 43 L.Ed. 320, 322. In determining the public policy of this state, legislative enactments must yield to constitutional provisions, and judicial decisions must recognize and yield to constitutional provisions and legislative enactments. Progressive Life Ins. Co. v. Dean (1936), 192 Ark. 1152, 97 S.W.2d 62; Electrical Contractors' Ass'n v. A.S. Schulman Elec. Co. (1945), 391 Ill. 333, 63 N.E.2d 392. Judicial decisions are a superior repository of statements about

public policy only in the absence of constitutional and valid legislative declarations. State ex rel. Holt v. District Court (1936), 103 Mont. 438, 446, 63 P.2d 1026, 1029; State v. Gateway Mortuaries, Inc. (1930), 87 Mont. 225, 235, 287 P. 156, 157.

## PUBLIC POLICY AS EXPRESSED IN THE CONSTITUTION AND STATUTES

We find nothing in the Montana Constitution declaring a public policy on the question before us. We therefore turn to relevant statutes and case law construing the same.

Prior to adoption of this state's comprehensive insurance code, Sections 33-1-101 et. seq., MCA, the law of Montana provided that "[a]n insurer is not liable for a loss caused by the willful act of the insured; but he is not exonerated by the negligence of the insured, or of his agents or others." Section 40-604, R.C.M. 1947 [repealed 1959]. This statute was based on Cal.Ins.Code Section 533 (West 1972), which has been construed to prohibit insurance coverage of punitive damages in most instances in California. See, e.g., City Products Corp. v. Globe Indem. Co. (1979), 88 Cal.App.3d 31, 151 Cal.Rptr. 494. See generally Comment, Insurance for Punitive Damages: A Reevaluation 28 Hastings L. J. 431, 446-58 (1976) (discussion of California public policy against insurance coverage of punitive damages). Section 40-604 is no longer law in Montana, having been repealed upon adoption in 1959 of the insurance code. Transamerica argues that repeal "does not mean that the legislature intended to bless the sins of cheats, frauds, and oppressors, and absolve them from wrongdoing." While there is some truth in this

-5-

assertion, we conclude that not even Transamerica would argue that a repealed statute has a life beyond the grave. If there is a public policy against permitting coverage, it must flow from an existing statute.

Our attention is also directed to the punitive damages law, Section 27-1-221, MCA, which provides that:

> "[i]n any action for a breach of an obligation not arising from contract where the defendant has been guilty of oppression, fraud, or malice, actual or presumed, the jury, in addition to the actual damages, may give damages for the sake of example and by way of punishing the defendant."

There is nothing in this statute amounting to an express statement on the public policy issue before us. Nevertheless, Transamerica reasons syllogistically that, because punishment is an explicit aim of applying punitive damages, and because punishment, to be such, must cause its recipient to suffer, there can be no punishment if a defendant is permitted to, in effect, "shift" the financial burden of the imposed punishment to his or her insurance carrier. Transamerica thus concludes that a public policy against coverage emanates from the concept of punishment as embodied in the statute. This is the conclusion reached by courts in some states with the same or similar punitive damage laws, see, e.g., City Products, supra (construing Cal.Civ.Code Section 3294, which contains virtually the same language as Section 27-1-221). Although we are impressed with the reasoning behind Transamerica's argument, we reject it, for reasons discussed infra, as an inaccurate expression of the practical consequences of applying punitive damages law in some cases in Montana.

Transamerica also directs our attention to Section

-6-

28-11-302, MCA, which provides that "[a]n agreement to indemnify a person against an act thereafter to be done is void if the act be known by such person, at the time of doing it, to be unlawful." Transamerica reasons that, because insurance is a contract of indemnity, Section 28-11-302 operates as an express policy against coverage for tortious acts warranting imposition of punitive damages. We reject this interpretation.

Modern insurance contracts typically provide coverage for a host of tortious activities, with the assurance that the insured will be indemnified at least for compensatory damages arising from unlawful conduct by the insured; e.g., libel and slander, malicious prosecution, etc. Even Transamerica would not argue that Section 28-11-302 erects a bar to liability insurance for compensatory damages, be they awarded for ordinary negligence or malicious, fraudulent or oppressive conduct. The need to reduce financial risks and promote economic stability in modern society has rendered this statute applicable only to conduct defined as criminal.

In summary, we find no express policy by the legislature on the subject of insurance coverage for punitive damages. Although reasoned arguments can be made for reading some kind of prohibition into the language of the punitive damages statute, we decline to do so without first examining judicial construction of that statute and then considering the practical consequences of awarding punitive damages.

## PUBLIC POLICY IN LIGHT OF JUDICIAL DECISIONS

As noted above, a major aim of awarding punitive

damages is punishment of the defendant for oppressive, fraudulent or malicious conduct. We have also recognized that an award of punitive damages can serve as a deterrent to like conduct by other individuals. First Security Bank v. Goddard (1979), 181 Mont. 407, 423, 593 P.2d 1040, 1049; Butcher v. Petranek (1979), 181 Mont. 358, 363, 593 P.2d 743, 745. Whether both goals will be served adequately by permitting insurance coverage of punitive damages has been the principal concern of courts that have already addressed the coverage question.

Several courts have followed the lead of the Court of Appeals of the Fifth Circuit and have concluded that the mutual goals of punishment and deterrence are defeated if coverage is permitted. In Northwestern Nat'l Cas. Co. v. McNulty (5th Cir. 1962), 307 F.2d 432, Circuit Judge John Minor Wisdom made this oft-quoted observation:

> "Where a person is able to insure himself against punishment he gains a freedom of misconduct inconsistent with the establishment of sanctions against such misconduct. It is not disputed that insurance against criminal fines or penalties would be void as violative of public policy. The same public policy should invalidate any contract of insurance against the civil punishment that punitive damages represent.
>
> "The policy considerations in a state where . . . punitive damages are awarded for punishment and deterrence, would seem to require that the damages rest ultimately as well as nominally on the party actually responsible for the wrong. If that person were permitted to shift the burden to an insurance company, punitive damages would serve no useful purpose. Such damages do not compensate the plaintiff for his injury, since compensatory damages already have made the plaintiff whole. And there is no point in punishing the insurance company; it has done no wrong. In actual fact, of course, and considering the extent to

> which the public is insured, the burden
> would ultimately come to rest not on the
> insurance companies but on the public,
> since the added liability to the
> insurance companies would be passed along
> to the premium payers. Society would
> then be punishing itself for the wrong
> committed by the insured."

307 F.2d at 440-41. For similar views, see City Products

Corp., supra; Ford Motor Co. v. Home Ins. Co. (1981), 116

Cal.App.3d 374, 172 Cal.Rptr. 59; Hartford Acc. & Indem. Co.

v. Village of Hempstead (1979), 48 N.Y.2d 218, 397 N.E.2d

737, 422 N.Y.S.2d 47; First Nat'l Bank of St. Mary's v.

Fidelity & Deposit Co. (1978), 283 Md. 228, 389 A.2d 359,

367 (Levine J., dissenting); Harrell v. Travelers Indem. Co.

(1977), 279 Or. 199, 567 P.2d 1013, 1022 (Holman, J.,

dissenting).

Upon reflection, we grant the intellectual appeal of

Judge Wisdom's reasoning, and recognize that it has been

both praised and followed in other jurisdictions.

Nevertheless, we find that this reasoning does not address

the substance of punitive damages law as applied in Montana.

To determine public policy concerning insurance coverage of

punitive damages solely on deductive conclusions like those

articulated by Judge Wisdom "is to lean upon a slender

reed." Missouri v. Holland (1920), 252 U.S. 416, 434, 40

S.Ct. 382, 384, 64 L.Ed. 641, 648.

Oregon Supreme Court Justice Hans Linde correctly

observed in his concurring opinion in Harrell, supra, that

"[a] court-made public policy against otherwise lawful

liability insurance can be defended, not because the purpose

of punitive damages is always deterrence and because

insurance will always destroy their deterrent effect, but

only when these considerations apply." (emphasis his). 279

Or. 199, 567 P.2d at 1029. Empirical observation informs us that many kinds of willful and wanton conduct are never successfully deterred by punitive damage awards. This is especially true in automobile accident cases. See, e.g., the discussion in Lazenby v. Universal Underwriters Ins. Co. (1964), 214 Tenn. 639, 383 S.W.2d 1, concerning the failure of civil and criminal sanctions to deter wrongful conduct on the highways. We have few doubts that the deterrent impact is minimal in cases involving other types of tortious conduct. This leaves punishment as perhaps the only effectively realizable goal of awarding punitive damages. However, as will be pointed out in the discussion infra, punishment in the context of punitive damages may come as a wholly unanticipated aspect of one's conduct, thus weakening the case against permitting insurance coverage of all punitive damage awards.

In the instant dispute, First Bank fears that its insurance contract with Transamerica will become virtually worthless if it is exposed to punitive damage awards without the possibility of coverage. The Bank also claims that such a fine line exists between conduct justifying imposition of punitive damages and conduct not justifying such damages that permitting coverage is not in violation of public policy. Both arguments warrant serious attention.

The contract issued by Transamerica to First Bank is not unlike many insurance agreements. It includes coverage for false arrest, detention, or imprisonment, malicious prosecution, wrongful entry or eviction, libel and slander, racial or religious discrimination, and wrongful repossession. All of these torts give rise to claims for

punitive damages; on this there is no dispute. In many cases involving these torts, actual damages may be minimal, but the punitive damages extremely high. Indeed, many claims for relief are not made financially worthwhile without the prospect of recovering punitive damages. See Harrel, supra, 279 Or. 199, 567 P.2d at 1029 (Linde, J., concurring). Assuming that coverage was deemed contrary to public policy, and in the event of minimal, if any compensatory damages, an insured facing a significant award of punitives would receive little solace from what would amount to a worthless insurance policy.

The "fine-line" problem raised by First Bank also suggests that a public policy against coverage would have less than desirable results, especially where the defendant is again assessed a particularly large punitive damage award. A consistent theme running through cases holding that public policy does not forbid insurance coverage is that juries and judges typically award punitives for a broad range of conduct not often described as willful or wanton, but as merely reckless or unjustifiable. When combined with the possibility that different fact finders in similar fact situations may reach differing conclusions as to the availability of punitive damages, the argument for denial of coverage becomes difficult to sustain. See Skyline Harvestore Systems, Inc. v. Centennial Ins. Co. (Iowa 1983), 331 N.W.2d 106; First Nat'l Bank of St. Mary's, supra; Harrel, supra; Lazenby, supra. See also Comment, Insurance Coverage of Punitive Damages 84 Dick.L.Rev. 221, 231-33 (1980). First Bank also emphasizes, and not without good reason, that a defendant may be subject to a punitive damage

award for conduct not considered or known to be wrongful prior to imposition of the award. See. e.g., Gates v. Life of Montana Ins. Co. (Mont. 1983), 668 P.2d 213, 40 St.Rep. 1287 (reinstating punitive damage award against defendant for conduct which at time committed was not actionable). In these instances, forbidding coverage after the fact may work an injustice to unsuspecting defendants.

We have recently attempted to come to grips with the problem of uncertainty in the area of punitive damages. In Owens v. Parker Drilling Co., (Mont. 1984), _____ P.2d _____, 41 St.Rep. 66, this Court acknowledged the expanded availability of punitive damage awards based on concepts like gross negligence, recklessness and unjustifiability. With respect to presumed malice as a ground specified in Section 27-1-221, MCA, for imposing exemplary or punitive damages, this Court adopted the following standard:

> "When a person knows or has reason to know of facts which create a high degree of risk of harm to the substantial interests of another, and either deliberately proceeds to act in conscious disregard of or indifference to that risk, or recklessly proceeds in unreasonable disregard of or indifference to that risk, his conduct meets the standard of willful, wanton, and/or reckless to which the law of this State will allow imposition of punitive damages on the basis of presumed malice."

Owens, supra, 41 St. Rep. at 69. Although we have described this standard as "more definitive and perhaps more stringent than those of the past," Owens, supra, 41 St.Rep. at 69, we acknowledge that fact-finders may still wrestle with concepts like recklessness and reasonableness, such that defendants may not know that their conduct constituted presumed malice until after trial, and that a defendant in

-12-

one case may never know the sting of punitive damages while another defendant in a similar case may be faced with financing a sizeable award. Similarly, we have yet to work out a definitive standard for "oppression" within the meaning of Section 27-1-221.

Even though we are further down the road to refining the concept of punitive damages than are many other state courts, the law is still in such a state of flux as to warrant caution on the issue of whether public policy prohibits coverage of punitive damages in all cases. We therefore decline the opportunity to define limits for insurance coverage of punitive damages. Insurance companies are more than capable of evaluating risks and deciding whether they will offer policies to indemnify all or some conduct determined by judges or juries to be malicious, fraudulent or oppressive. A likely response to this opinion by some carriers may be the drafting of specific exclusions of coverage of punitive damages. However, the fact that some individuals may be willing to pay higher premiums for such coverage may convince carriers to extend coverage in some situations. It is conceivable that a combination of different approaches by insurance companies may result in a delineation of the limits of coverage better than anything this Court could establish.

CONCLUSION

We find that providing insurance coverage of punitive damages is not contrary to public policy. Transamerica admittedly has set forth a strong argument in support of an opposite holding, but we find the consequences of adopting

-13-

that position unacceptable. The problems posed by insurance coverage of punitive damages are unquestionably like those inherent in the Gordian Knot. Unlike Alexander the Great, however, we cannot make a clean slice through our version of the Knot, in order to unravel all the aspects of the question before us, without working an injustice to many policy holders. Alexander dealt only with an inanimate object; we deal with people. Use of the judicial sword therefore is inappropriate in this case. Here, we must "untie" the knot, painstaking as the process may be. Until such time that the law of punitive damages is more certain and predictable, or until the legislature alters the law of punitive damages or expressly declares a policy against coverage in all cases, we leave the decision of whether coverage will be permitted to the insurance carriers and their customers.

_____
Justice

We concur:

_____

_____

_____
Justices

_____
Honorable Gordon R. Bennett,
District Judge, sitting in
place of Chief Justice Frank
I. Haswell.

Mr. Justice Frank B. Morrison, Jr., specially concurs and will file a special concurrence later.